826 A.2d 783 (2003)
362 N.J. Super. 16
STATE of New Jersey, Plaintiff-Respondent,
v.
Ronald PATTON, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 7, 2003.
Decided July 7, 2003.
*784 Robert Seelenfreund, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Mr. Seelenfreund, of counsel and on the brief).
Mark Paul Cronin, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Acting Attorney General, attorney; Lisa Sarnoff Gochman, Deputy Attorney General, of counsel and on the brief).
John C. Whipple argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey, (Mr. Whipple and Mary Gibbons Whipple, on the brief).
Before Judges CONLEY, CARCHMAN and PARRILLO.
The opinion of the court was delivered by CARCHMAN, J.A.D.
During the early morning hours of August 10, 1998, police found the lifeless body of Gloria Deen Hoke in an alley in Camden. In the early evening of the same day, the Camden police, acting on an anonymous tip of a "man with a gun," stopped, searched and arrested defendant Ronald Patton on a weapons offense and took him to police headquarters. During the ensuing nineteen hours between the time of defendant's arrest and the commencement of interrogation, law enforcement officers fabricated an account of Hoke's murder. A law enforcement officer, posing as an eyewitness, was "interviewed" on an audiotape that was later played to defendant who, despite his early denials of involvement, upon hearing the audiotape, confessed to the murder. The fabricated audiotape, identified as such, was later introduced into evidence at trial, and defendant was convicted of murder and related offenses. His motion to suppress the confession and objection to the use of the fictitious audiotape at trial were denied as was his challenge to the initial arrest and search.
We reverse. We hold that law enforcement officers may not fabricate evidence to prompt a confession and later introduce that police-fabricated evidence at trial to support the voluntariness of the confession. We reverse the denial of the motion to suppress and remand for a new trial. We also order on remand that the judge reconsider the initial stop and search of defendant in light of the United States Supreme Court's decision in Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000).

I.

A.
We expand our discussion of the facts adduced at both the motion to suppress and trial. After discovering Hoke's body, the police determined that she had been shot nine times including seven times in the back. Later the same day, at approximately 4:00 p.m., the victim's brother informed police that defendant, who the brother knew by the street name of "Physical," and the victim had argued the day before. Following information received from an allegedly anonymous tip, at approximately *785 8:00 p.m., the police arrested defendant.[1]
The police did not begin questioning defendant immediately. During the nineteen-hour period between defendant's arrest and the commencement of the interrogation on August 11, 1998, the police fabricated an audiotape depicting a fictitious eyewitness to the crime "[t]o let the person we were going to interview think there was an individual who saw him do what we think he did." Investigator Frank Falco of the Camden County Prosecutor's Office described the process of creating the audiotape:
A. We made up a tape, myself and Sergeant Harry Glemser of the homicide unit and Homicide Investigator Aida Marcial [of the Camden County Prosecutor's Office] where Aida Marcial and myself interrogated Sergeant Glemser who we referred to as PO 150, or Informant 150, and we basically faked a tape of what we wanted to look like a witness to the incident.
Q. So Investigator Glemser was posing
A. Sergeant Glemser.
Q. Sergeant Glemser was posing as a witness to the homicide of Gloria Hoke?
A. Yes.
Q. And the information that Sergeant Glemser would have related on the tape, where did that come from?
A. We hadI think [Detective] Monica [Davenport of the Camden Police Department] had told me and [Investigator] Willie [Mahan of the Camden County Prosecutor's Office] the day before they had some information from the brother of the victim.
Q. Okay. So the information that Sergeant Glemser relayed would have been information that had been developed during the investigation?
A. Correct.
At approximately 3:00 p.m. on August 11, the police began interrogating defendant as to the murder. Defendant signed a Miranda[2] card at 3:10 p.m., and when the police informed defendant that they wanted to speak to him about Hoke's murder, defendant initially replied that he was at his girlfriend's house on the night of the murder. The interrogators then told defendant that they had an eyewitness to the murder, and again defendant offered no response. After ten minutes of this "pre-interview," the police indicated that they would play an audiotape of the eyewitness for defendant and did so. These are the relevant portions of the audiotape:[3]
A.M. Today is Tuesday, August the 10th, 1998. The time now is 11:15 a.m. I am Senior Investigator Aida Marcial. I'm with the Camden County Prosecutor's Office, Homicide Unit. With me today is Investigator Frank Falco, also from the Camden City, excuse me, Camden County Prosecutor's Office, Homicide Unit. Ah ... Currently we're at the Camden County Prosecutor's Office about to obtain a second tape[d] statement from Confidential Source 150, ... for the purpose of this tape we will oblit [sic] his ah ... name and vital information. For the purpose *786 of this tape we'll just ah ... refer to you as Confidential Informant.... Is that alright with you?
A. Yeah that's alright.
F.F. Okay, we're gonna [sic] refer to Camden Case Number XX-X-X-XXX. Ah ... is it true, Confidential Informant 150 [that] in the pre-interview you gave us some information where you ... you knew who was involved in this homicide?
A. Yes that's right.
F.F. Okay, the homicide occurred on August 6, 1998, at approximately 1:30 a.m. Are you aware of that?
A. Yes ... I guess about 1:30, that sounds right.
F.F. Okay, did you have occasion to be in that area or are you familiar with that area around Sixth and Bailey?
A. Yeah.
F.F. Alright, now you're here on charges, ah ... you were picked up at a drug ah ... scoop ah ... earlier today and you were charged with distribution of CDS, is that correct?
A. Yup.
F.F. Okay, and we spoke about the fact that if you were gonna [sic] cooperate with us and give us some truthful information, that we could see what we would maybe do for you if the information turned out to be correct,... is that correct?
A. Yeah ... you said you would drop the charges on me if ... if my information was right.
F.F. Alright, we didn't say we would drop the charges, we said we'll see what we could do.... We didn't make any promises, is that correct?
A. That's yeah.
F.F. Okay ... when you were picked up earlier today ... you were brought into our office and ah ... we started talking to [you] about this particular homicide that occurred up there ah... two nights ago ... ah ... you said you had some information that you could offer us, is that true?
A. Yeah.
F.F. Alright, ah ... there was an individual up there that we suspect of possibly being the shooter in this particular homicide ah ... is it true that you gave us a name of somebody who you described as being the shooter?
A. Yup ... that's right.
F.F. And how did you say that you knew that person?
A. Well, I know the girl Gloria ah ... pretty good ...
F.F. Ah-huh.
A. And I wonder if she ...
F.F. Now ... okay, go [a]head.
A. Off ... off and on, I guess maybe couple years ah ... you [sic] they call her Genie ...
F.F. Right ... right.
A. And you ... you ... alright, know, you know I'm out that [sic] there sell[ing] drugs out there once and a while ...
F.F. Ah-huh.
A. Ah ... she'll be you know coming up to me ... they coming [sic] up a few other fellows and you know want[ing to] get a freebee ... you know what I mean ... to ah ... So I was talking to her earlier that night and she told me that she had an argument with this dude they call Physical ... ah ... Ron I think is his first name.... And she asked me for a piece. I gave her one, and then later on ...
F.F. Okay, excuse [me], when you say "piece," what do you mean by a piece?
*787 A. Well, I gave her a little ... a little bit of powder ...
F.F. Okay.
A. But I didn't charge her for it though...
F.F. Right.
A. She's like, that's the way she is, you know, she just tries to come up and ah ... tries to sponge a piece off... off different people, you know.
F.F. Has she sponged drugs off you before?
A. Yeah.
F.F. Okay ... ah ... people out there have [had] problems with her doing that before?
A. Ah ... ah ... I don't know if they have problems with her, but you know, she's like [a] pain in the ass type... you know ... sometimes they just give it to her to just to get rid of her you know what I mean ...
F.F. Okay, the information on the person that might have shot her ah ... what were you helps [sic] us with in that area?
A. Well I seen [sic] when she came busting out of the crib, you know what I mean ... running down the alley and shit ... and I heard all these shots and ah ... when I looked up you know I see this dude chasing behind shootin' at her and I, you know, I know who the dude is I've seen ... I've seen him around out that way and ...
A.M. And how many shots you ... you think you heard?
A. Ssshhh ... seven ... eight ... nine... something like that.
A.M. So it was a lot of shots?
A. Yeah.
F.F. This guy that you said that you seen [sic] out there before, can you describe him for us?
A. Yeah ...
F.F. Ah ...
A. That's the ... that's the dude . . . that's ... that's the dude ... yeah...
F.F. Okay. I'm ... Let the record reflect that I'm showing ah ... Confidential Informant one picture ... ah. . . picture of Ronald Patton ... Okay ... you ...
A. Okay ...
F.F. Said you know him from the streets...
A. Yeah, but I didn't know his last name, ... but that's the dude....
F.F. Alright, where did you know him as [sic]?
A. I known [sic] him as Ron or sometimes they call him Physical.
A.M. How tall would you say he is?
A. He's . . . he's about five-foot-seven... five-foot-six, something like that.
A.M. How [much] do you think he weighs?
A. Oh probably about, I don't know, 170 ... 160 ... something ...
A.M. Is he Black, Spanish, White? ...
A. Who, this guy Ron?
A.M. Yeah.
A. Black.
A.M. (Inaudible) ...
F.F. Okay, you also said earlier in a conversation ... or in the pre-interview rather, that you knew his girlfriend or girl that he had relations with before in the past?
A. Yeah ... Lora ...
F.F. Right Lora ...
A. Yeah ah-huh ... I know her.

*788 F.F. You know Lora.
A. Ah-huh.
F.F. Okay, and did you know him to have [a] problem with her at one time?
A. Yeah ...
F.F. Okay.
A. He step [sic] on her one time with like ... beat her up or some shit.
F.F. Okay.
A.M. Is that something that you heard out on the street or is that something...
A. She told me ...
F.F. Okay, did she ever tell you something about a restraining order that she had against him?
A. Yeah, he wasn't suppose [sic] to come around her or something ... or he get [sic] locked up and ... if I see him around, let her know ...
F.F. Ah-huh.
A. Shit like that.
F.F. Ah ... What else do you know about this incident that you can tell us?
A. Well ...
F.F. What ...
A. I don't want to get into trouble if I say this you know what I mean.
F.F. Ah-huh.
A. So ...
F.F. We can't make any promises you know. We said before that we would help you out as much as we could ... you know with the drug charge, but we can't promise you nothing. You said you would tell us the truth, and that's why we're here and that's why you're on tape.
A. Well, a little bit after it happen[ed]... you know I see she was hurt you know what I mean ... I could tell that she was dead ... when I was there.
F.F. Ah huh.
A. The person I was with that I told you earlier that I didn't want to name ah ... was there with me ... can verify that you know ... saw what hap ... same thing I seen [sic] happen ...
F.F. Okay.
A. She didn't have to go out like that man ...
F.F. Alright, is there anything further you would like to add to this statement that you feel is pertinent or important?
A. No.
F.F. Are any threats or promises been [sic] made to you to give this statement?
A. Well, just to tell the truth ... and that you see [sic] what you can work with me on my charges.
F.F. (inaudible) right ... Okay, the CDS charges?
A. Yes.
F.F. Okay, is there anything else you would like to [add to] this statement?
A. No man, except I, you know, I know her family, man ... I feel bad ... I know her brother.
A.M. And where does her brother live?
A. I think he lives somewhere on Erie.
A.M. Right near by.
A. I was talking to him, man.
A.M. And how's he ... what did he say?
A. Ah ... he's fucked up, man ... you know ... you know I ... I've told him I knew ... I knew ... I had talked to her earlier before that shit happened, but I didn't tell [him], you know, what I'm tellin' you all.
A.M. Did you tell anybody at all?
A. No.

*789 A.M. What you're telling us today.
A. No ... he asked me did I know anything, I told him no, but ... when I got caught today I figured fuck it ... you know ...
F.F. Okay, the time is around 11:30.
A.M. The time ... the time now is about 11:30 a.m.
F.F. The statement is now concluded.
Immediately after the investigators played the audiotape, defendant asked: "Who was that motherfucker?" Defendant then confessed to murdering Hoke and agreed to give a taped statement. Once defendant confessed, the police ended the interrogation. The entire interrogation process, including the confession, consumed less than one hour.
According to defendant, after his arrest and at the time of his statement, he was suffering from the effects of heroin withdrawal, and his statement was "coerced." He claimed that the "detectives told me that if I gave a statement that they was [sic] going to take me [to] Cooper Hospital for detox, and then they told me that I had a tapethey had a tape referring that somebody witnessed something I supposed to have done [sic]." The jail's admission form indicated that defendant was suffering from "diarrhea, nausea, vomiting, and chills[.]"
Defendant was thereafter indicted by a Camden County Grand Jury for first-degree murder, N.J.S.A. 2C:11-3a(1); second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4a; third-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5b; fourth-degree possession of a defaced firearm, N.J.S.A. 2C:39-9e; third-degree hindering apprehension or prosecution, N.J.S.A. 2C:29-3b(1); and second-degree possession of a weapon by a person convicted of a crime, N.J.S.A. 2C:39-7b.
In a pretrial motion, defendant moved to suppress his confession. The judge denied that motion and rejected defendant's claim that he was suffering from drug withdrawal symptoms.
Defendant also challenged the use of the fabricated audiotape, a challenge later repeated during trial. The judge rejected that claim as well, concluding that the technique was not coercive. The judge opined that "[p]sychologically sophisticated interrogation techniques are proper because, while they are certainly effective enough to elicit confessions from guilty suspects, they would not cause an innocent person to confess." The judge reasoned:
There is no question that police interrogation of persons suspected of crimes constitutes a necessary practice in the pursuit of crime solving and justice. Under the proper circumstances, confessions serve a useful social purpose. Because many criminal cases lack witnesses or physical evidence, police often would be incapable of collecting enough evidence to punish the wrongdoer without a confession. Furthermore, as a practical matter, a confession often minimizes the need for further police investigation and often leads to conviction, both of which reduce costs to taxpayers. Nevertheless, the potential for conflict arises because criminal offenders "ordinarily do not utter unsolicited, spontaneous confessions." Thus, the police are confronted with the difficult task of procuring a confession from a less than willing suspect.
There is no question that the use of trickery and deception provides a highly effective means of extracting confessions; and given the important role of confessions in law enforcement, police must be free to employ effective means of obtaining them. Thus, police deceit is justified as a necessary and proper *790 means of ensuring effective law enforcement and crime control.
To elicit a confession from a guilty suspect, the interrogator must be allowed to use techniques which effectively decrease the suspect's resistance to confess, while at the same time increasing a desire to tell the truth. Out of necessity, these techniques are psychologically sophisticated. They involve persuasion, insincerity, and potential trickery and deceit. They do not involve coercion, or compulsion and they do not remove a suspect's free will. Most assuredly, none of the techniques or tactics presented here would cause an innocent person to confess a crime. As to whether defendant's will was overborne by the investigator's deceit, the court need only look to the defendant's own testimony in which not a single word was said as to the impact of the faked tape upon his decision to confess.
The creation and use of the bogus eyewitness testimony was an astute decision by experienced investigators attempting to solve a brutal crime. Their actions were creative and unusual as well as being entirely appropriate and lawful.
[(Emphasis added) (footnotes omitted).]
At trial, the State proffered the police-fabricated audiotape for consideration by the jury as evidence of the voluntariness of defendant's confession. Included within the contents of the purported eyewitness account were references to incidents of domestic violence and "other bad acts" committed by defendant, an issue prompting an objection by defendant. Defendant moved for a mistrial after the audiotape was played, but the judge denied the application, opting to give a limiting instruction to the jury. The limiting instruction, which the judge determined to be "more than sufficient," advised the jury to consider the allegations of domestic violence not "for the truth of the statement or as proof that the defendant committed a violent act or is a bad person," but, as the judge advised, the audiotape could be considered "only as it relates to the effect that the statement may have had upon the state of mind of the defendant."
Defendant was convicted, and now appeals.
On appeal, defendant raises the following issues:
POINT I
THE INTERROGATION TECHNIQUE USED BY THE POLICE TO INDUCE DEFENDANT'S CONFESSIONTHEY CREATED A TAPE RECORDING OF A FAKE EYEWITNESS TO THE MURDER AND PLAYED IT FOR THE DEFENDANT AS IF IT WERE GENUINE EVIDENCERENDERED IT INVOLUNTARY, AND THE TRIAL COURT'S DECISION TO ADMIT THE CONFESSION INTO EVIDENCE VIOLATED THE FEDERAL AND STATE CONSTITUTIONS, AS WELL AS STATE COMMON LAW.
POINT II
BECAUSE THE POLICE HAD NO REASONABLE SUSPICION TO STOP THE DEFENDANT, THE ENSUING PAT DOWN AND SEIZURE OF THE GUN WAS ILLEGAL.
A. The Gun And The Testimony Of Detective Storey Must Be Suppressed As Fruits Of The Illegal Search.
B. There Was No Break In The Causal Chain Between Defendant's Illegal Arrest And His Confession. (Partially Raised Below)
POINT III
*791 THE TRIAL COURT'S DECISION TO ALLOW THE JURY TO HEAR THE TAPE RECORDING OF THE FAKE EYEWITNESS, IN COMBINATION WITH THE PROSECUTOR'S OPENING STATEMENT AND THE TESTIMONY OF INVESTIGATOR FALCO, VIOLATED STATE V. BANKSTON, 63 N.J. 263, 307 A.2d 65 (1973) AND ITS PROGENY: A MISTRIAL SHOULD HAVE BEEN GRANTED, AS THIS ERROR WAS NOT CAPABLE OF BEING CURED WITH A LIMITING INSTRUCTION.
POINT IV
DEFENDANT'S WAIVER OF A JURY TRIAL ON COUNT SIX OF THE INDICTMENT, THE CERTAIN PERSONS NOT TO HAVE WEAPONS CHARGE, VIOLATED RULE 1:8-1(a) AND WAS NOT KNOWINGLY AND INTELLIGENTLY MADE. (Not Raised Below)
POINT V
DEFENDANT'S SENTENCE IS BOTH ILLEGAL AND MANIFESTLY EXCESSIVE.
A. The Trial Court's Decision To Apply NERA To The Murder Charge Was Incorrect.
B. The Discretionary Extended Term Imposed On The Conviction For Certain Persons Not To Have Weapons Is Illegal.
C. The Trial Court Abused Its Discretion By Imposing An 18 Year Sentence With A 9 Year Period Of Parole Ineligibility On Court Six, To Run Consecutively To The Life Sentence On The Murder Conviction.
D. The Defendant Was Denied Gap Time That He Is Entitled To Under N.J.S.A. 2C:44-5b(2).
We address each of these issues.

B.
The dominant issue on this appeal is the propriety and use of the police-fabricated audiotape prompting the confession. This issue implicates two considerations: the voluntariness of the confession and whether the use of such evidence both in the interrogation process and thereafter at trial comports with both Federal and State Constitutional protections. We commence our analysis with an historical overview of police interrogation practices.
Over the last century, police interrogation procedures evolved from the use of physical force to extract confessions to the modern day use of psychologically coercive techniques. See Miranda, supra, 384 U.S. at 446-48, 86 S.Ct. at 1602, 16 L. Ed.2d at 707-09; Jerome H. Skolnick and Richard A. Leo, The Ethics of Deceptive Interrogation, 11 Crim. Just. Ethics 3 (Winter/Spring 1992). The shift away from physically coercive police practices began in the 1930s in response to several studies, the most prominent of which was the Wickersham Report to Congress, National Commission on Law Observance and Enforcement, Report No. 11, Lawlessness in Law Enforcement (1931) (Wickersham Report), decrying the use of brutality and "third degree"[4] techniques to extract confessions. Miranda, supra, 384 U.S. at 446-48, 86 S.Ct. at 1602, 16 L.Ed.2d at 707-09. In 1936, the United States Supreme Court specifically banned the use of physical force during police questioning. See Brown v. Mississippi, 297 U.S. 278, *792 286, 56 S.Ct. 461, 465, 80 L.Ed. 682, 687 (1936) (holding that the use of confessions to convict three African-American defendants who had been whipped and beaten by the police until they confessed to murder was "a clear denial of due process.").
By the 1960s, studies indicated that while police in some jurisdictions continued to use physical force, the majority practice was to use psychologically-coercive methods to extract confessions, including the use of trickery. Miranda, supra, 384 U.S. at 448-49, 86 S.Ct. at 1614, 16 L.Ed.2d at 708-09. For example, one police manual cited in Miranda advocated the use of fake line-up procedures where the suspect would be chosen as the perpetrator of the crime by a "coached" witness or in a "reverse-line-up," the suspect would be identified by fictitious witnesses as the perpetrator of different offenses. Miranda, supra, 384 U.S. at 453, 86 S.Ct. at 1616-17, 16 L.Ed.2d at 711 (citing O'Hara, Fundamentals of Criminal Investigation, 105-06 (1956)). The manual explained: "It is expected that the subject will become desperate and confess to the offense under investigation in order to escape from the false accusations." Id. (quoting O'Hara, supra, at 106).
To address such interrogation methods, the United States Supreme Court mandated in Miranda that for police to obtain a voluntary confession, they must inform suspects subject to custodial interrogation of their rights, including the right to remain silent and the right to an attorney. Miranda, supra, 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. While Miranda focused on informing suspects of their rights, it did not address the propriety or use of the psychologically coercive techniques it deplored, once suspects validly waived their rights. Yale Kamisar et al., Modern Criminal Procedure, 609-10 (8th ed.1994).
Other decisions have addressed the issue, and the use of psychological coercion including trickery and deceit by police has received judicial sanction. Without defining the limits of such conduct, the Supreme Court has upheld certain forms of trickery. See Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (holding confession was voluntary where police lied to defendant that his co-defendant had implicated him in the crime); see also Miller v. Fenton, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (upholding confession obtained after an hour long interrogation where the police lied about evidence they had against defendant, expressed sympathy toward defendant by indicating suspect was not a criminal and should receive psychiatric help, and where the suspect collapsed in a state of shock immediately after confessing).
But the Supreme Court has cautioned that psychological techniques may be just as coercive as the use of force. E.g., Chambers v. Florida, 309 U.S. 227, 238-39, 60 S.Ct. 472, 478, 84 L.Ed. 716, 722-23 (1940) (rejecting confessions of "young colored tenant farmers" who were questioned over a period of five days and then "broke" after an all-night interrogation session despite the lack of physical violence, noting that "Just as our decision in Brown v. State of Mississippi was based upon the fact that the confessions were the result of compulsion, so in the present case, the admitted practices were such as to justify the statement that `The undisputed facts showed that compulsion was applied.'"); see Blackburn v. Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242, 247-48 (1960) (reversing conviction where primary evidence was a confession from the insane defendant and noting "that the efficiency of the rack and the thumbscrew can be matched, given the proper subject, by more sophisticated modes of `persuasion.'"). *793 See also Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963) (invalidating confession after defendant was falsely threatened that her children would be taken away from her and she would lose her government benefits for them if she did not "cooperate"); Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (invalidating confession to murder where police officer, who was a "childhood friend" of defendant, falsely told defendant that his telephone confession had placed the officer's job at risk and losing his job would create a hardship for the officer's family).
Other Federal and State courts have similarly tolerated the use of trickery after a suspect has waived his Miranda rights permitting, among other forms of deceit, police falsely advising a defendant that the police possess incriminating evidence inculpating defendant for the alleged offense. See, e.g., Sovalik v. State, 612 P.2d 1003 (Alaska 1980) (defendant's fingerprints were found at the crime scene); State v. Cobb, 115 Ariz. 484, 566 P.2d 285 (1977) (same); State v. Jackson, 308 N.C. 549, 304 S.E.2d 134 (1983) (same); State v. Register, 323 S.C. 471, 476 S.E.2d 153 (1996) (defendant's tires and shoes matched impressions and prints found at murder scene and DNA linked him to crime), cert. denied, 519 U.S. 1129, 117 S.Ct. 988, 136 L.Ed.2d 870 (1997). And see Hopkins v. State, 19 Md.App. 414, 311 A.2d 483 (1973) (co-defendant made a statement incriminating defendant), cert. denied, 271 Md. 738 (1974); State v. Stubenrauch, 503 S.W.2d 136 (Mo.App.1973) (same); Commonwealth v. Jones, 457 Pa. 423, 322 A.2d 119 (1974) (same). See also Holland v. McGinnis, 963 F.2d 1044 (7th Cir.1992) (eyewitness linked defendant to crime scene), cert. denied, 506 U.S. 1082, 113 S.Ct. 1053, 122 L. Ed.2d 360 (1993); People v. Pendarvis, 189 Cal.App.2d 180, 10 Cal. Rptr. 923 (1961) (pharmacist identified defendant accused of forging a prescription for narcotics); In re D.A.S., 391 A.2d 255 (D.C.1978) (victim had identified defendant); State v. Manning, 506 So. 2d 1094 (Fla.Dist.Ct.App.1987) (medical records indicated defendant had same venereal disease as victim); State v. Boren, 224 N.W.2d 14 (Iowa 1974) (father accused of incest was told that daughter had passed a lie detector test), cert. denied, 422 U.S. 1008, 95 S.Ct. 2630, 45 L. Ed.2d 671 (1975); Springer v. Commonwealth, 998 S.W.2d 439 (Ky.1999) (police told defendant that they had been taping her telephone calls and began to play actual recording of phone calls, which actually did not contain any incriminating information); State v. Norfolk, 221 Neb. 810, 381 N.W.2d 120 (1986) (police referenced a non-existent autopsy report), aff'd, 941 F.Supp. 894 (D.Neb.1995). And see the following for additional cases involving the use of trickery and deception by police: McCormick on Evidence § 156 (5th ed.1999); 29A Am. Jur. 2d Evidence § 743 (1994); 3 William E. Ringel, Searches and Seizures, Arrests and Confessions, § 25.2(d)(2) (2d ed.1999); 2 Joseph G. Cook, Constitutional Rights of the Accused, § 6.6 (3d ed.1996); C.T. Drechsler, Annotation, Admissibility of Confession as Affected by its Inducement Through Artifice, Deception, Trickery, or Fraud, 99 A.L.R.2d 772 (1965).
New Jersey courts also have permitted the use of trickery in interrogations. See, e.g., State v. Cooper, 151 N.J. 326, 355-56, 700 A.2d 306 (1997) (upholding confession where police, after informing defendant of his Miranda rights, confronted suspect with evidence of his guilt and wrongly informed him that he could be facing life in prison for murder rather than a death sentence), cert. denied, 528 U.S. 1084, 120 S.Ct. 809, 145 L.Ed.2d 681 (2000); State v. Manning, 165 N.J.Super. 19, 30-31, 397 A.2d 686 (App.Div.1978) (upholding the admission *794 of a confession given after police lied to defendant that his co-defendant had already confessed as "[a] confession induced by deception or trickery is not inadmissible unless the method used was calculated to produce an untruthful confession or was offensive to due process.") (quoting Wharton, Criminal Evidence § 685 at 471-474 (13th ed.1973)), rev'd on other grounds, 82 N.J. 417, 413 A.2d 605 (1980).
This case presents a different circumstance than the other trickery cases. Thematic throughout most of the legion of cases approving the use of trickery and false representations by police officers is the common fact that the falsity emanates from the "voice" of the officer. The teachings of these cases support a view that a police officer in the interrogation process may, by the officer's statements, make misrepresentations of fact or suggest that evidence in the form of reports or witnesses exist that will implicate a suspect. That the "voice" of the misrepresentation is the police officer is a distinguishing factor between these decisions and those questioning the use of police-fabricated tangible evidence, the issue extant in this case.
The use of police-fabricated evidence to induce a confession has been addressed in other jurisdictions. In State v. Cayward, 552 So.2d 971 (Fla.Dist.Ct.App.1989), review dismissed, 562 So.2d 347 (Fla.1990), the police fabricated two scientific reports, one on stationery of the Florida Department of Criminal Law Enforcement, the other on stationery of a scientific testing organization, "Life Codes, Inc.," indicating that semen stains on the victim's underwear came from defendant. The police presented the reports to defendant during their interrogation, and "[s]ome time later during the interview, defendant confessed." Id. at 972. Noting that police deception does not render a confession involuntary per se, the court held that "the police overstepped the line of permitted deception," answering the question "whether there is a qualitative difference between the verbal artifices deemed acceptable and the presentation of the falsely contrived scientific documents challenged here," in the affirmative. Id. at 973.
In rendering its decision, the court focused on both constitutional and practical considerations. It first noted:
It may well be that a suspect is more impressed and thereby more easily induced to confess when presented with tangible, official-looking reports as opposed to merely being told that some tests have implicated him. If one perceives such a difference, it probably originates in the notion that a document which purports to be authoritative impresses one as being inherently more permanent and facially reliable than a simple verbal statement.
....
We think, however, that both the suspect's and the public's expectations concerning the built-in adversariness of police interrogations do not encompass the notion that the police will knowingly fabricate tangible documentation or physical evidence against an individual. Such an idea brings to mind the horrors of less advanced centuries in our civilization when magistrates at times schemed with sovereigns to frame political rivals. This is precisely one of the parade of horrors civics teachers have long taught their pupils that our modern judicial system was designed to correct. Thus we think the manufacturing of false documents by police officials offends our traditional notions of due process of law under both the federal and state constitutions. U.S. Const. amends. V, XIV; Fla. Const. art. I, §§ 9. [Cayward, supra, 552 So.2d at 974.] *795 Addressing practical concerns, the court noted that police-fabricated evidence was dangerous as:
Unlike oral misrepresentations, manufactured documents have the potential of indefinite life and the facial appearance of authenticity. A report falsified for interrogation purposes might well be retained and filed in police paperwork. Such reports have the potential of finding their way into the courtroom.
....
We are further concerned that false documents retained in police or state attorney's files might be disclosed to the media as a result of the public records law. A suspect's reputation could be unwittingly yet unfairly and permanently marred and his right to a fair trial jeopardized by the media's innocent reporting of falsified documents.

We can also conceive of an unintended scenario where a manufactured document, initially designed only for use in interrogation, might be admitted as substantive evidence against a defendant. Although one hopes that such an error would be discovered in preparation for trial, the reality of our courts' heavy caseloads is that counsel and trial judges routinely accept as true documents which appear to be reliable reports from known government and private agencies.
We shudder to think of the impact that questionable authenticity of court records might have not only on the trial level, but on the appellate level. We are routinely presented with documents in court files which we must assume to be genuine. To sanction the manufacturing of false documents, which have the potential of being admitted as substantive evidence, would severely diminish our confidence in relying upon facially valid documents in court files.
[Cayward, supra, 552 So.2d at 974-75 (emphasis added).]
The court finally noted that it was concerned with public perception of the police and fashioned a per se rule against such tactics stating that police-fabricated evidence "has no place in our criminal justice system." Id. at 974.
The rule enunciated in Cayward has been addressed in other jurisdictions. The West Virginia Supreme Court of Appeals cited Cayward with approval in State v. Farley, 192 W.Va. 247, 452 S.E.2d 50 (1994). Although Farley did not involve the fabrication of tangible evidence as the police there falsely told defendant that he had failed a polygraph test, the court warned in a footnote that it would not have upheld the validity of the confession if defendant had been shown a written document indicating that he failed the test. The court said:
We do not believe that merely telling the defendant that he did not do well on a polygraph examination without further elaboration is likely to encourage an innocent person to confess. Had the police intentionally fabricated more specific false results to obtain a confession, our view may very well be different. This is particularly true if the police had reduced these fabrications to a written report and disclosed it to the defendant. We definitely draw a demarcating line between police deception generally, which does not render a confession involuntary per se, and the manufacturing of false documents by the police which "has no place in our criminal justice system." State v. Cayward, 552 So.2d 971, 974 (Fla.Dist.Ct.App.1989).
[Farley, supra, 452 S.E.2d at 60 n. 13.]
The Supreme Court of Hawaii discussed Cayward in State v. Kelekolio, 74 Haw. 479, 849 P. 2d 58 (1993), a case that also did not involve the fabrication of evidence but *796 rather a verbal misrepresentation of evidence possessed by police. The Supreme Court of Hawaii, in a footnote, appeared to agree with the principle enunciated in Cayward, but ultimately adopted the rule that:
employment by the police of deliberate falsehoods intrinsic to the facts of the alleged offense in question will be treated as one of the totality of circumstances surrounding the confession or statement to be considered in assessing its voluntariness; on the other hand, deliberate falsehoods extrinsic to the facts of the alleged offense, which are of a type reasonably likely to procure an untrue statement or to influence an accused to make a confession regardless of guilt, will be regarded as coercive per se, thus obviating the need for a "totality of circumstances" analysis of voluntariness.

[Id. at 73.]
The court considered "intrinsic falsehoods" to include misrepresentations by police "regarding the existence of incriminating evidence." Id. "Extrinsic falsehoods," on the other hand, involved misrepresentations beyond the scope of the crime, such as "assurances of divine salvation upon confession ... [or] health treatment[;] ... promises of more favorable treatment in the event of a confession ... or misrepresentations of legal principles[.]" Id. at 73-74 (citations omitted). Only confessions based on extrinsic falsehoods were per se inadmissible; confessions resulting from intrinsic falsehoods were subject to the "totality of the circumstances" test to determine whether the interrogation technique should be "condemned under principles of due process." Id. at 74 (citing Cayward as an example of such a technique). Kelekolio appears to agree with the Cayward result, but would have reached that determination by using a totality of the circumstances test rather than applying a per se rule.
The majority of the Supreme Court of Nevada followed Kelekolio`s intrinsic/extrinsic dichotomy in Sheriff, Washoe County v. Bessey, 112 Nev. 322, 914 P.2d 618 (1996) (Bessey), and rejected a per se rule that police-created evidence should not be admitted into evidence. Id. In Bessey, police created a "falsified lab report" indicating defendant had committed a sexual assault against a minor. Because the majority considered that the fabricated lab report "went to the strength of the evidence against [defendant], a consideration intrinsic to the facts of the alleged offense," the court applied the totality of the circumstances test and determined, without explanation, that "[t]here [was] nothing about the fabricated document presented to [defendant] in this case which would have produced a false confession." Id. at 621. The majority also criticized Cayward, in concluding that a verbal lie by police and one "embodied in a piece of paper" was "a distinction without a real difference." Id.; cf. Jerome H. Skolnick and Richard A. Leo, supra, 11 Crim. Just. Ethics 3 (disagreeing with Cayward`s distinction between oral and tangible police trickery but arguing that both forms of police trickery should be banned). Citing no authority, the court rejected any suggestion that the fabricated evidence would find its way into the trial itself.
In a cogent response, the dissenting judges asserted that the majority was "providing police and prosecutors with an investigatory weapon which they have little if any need for, but which has great potential for intentional abuse and inadvertent harm and havoc." Id. at 622 (Rose, J., dissenting). They argued that permitting police to use verbal deception while prohibiting the use of "falsehoods or deception in written or other tangible form... strikes an appropriate balance between the necessity for the police to use *797 some deception in developing evidence, while prohibiting the carrying of such deception or falsehoods to a truly unfair advantage over an accused." Id. The dissenters distinguished the cases relied upon by the majority that did not involve the fabrication of evidence as "those cases did not consider the reliability of a confession induced by confrontation with ostensibly irrefutable hard scientific evidence, as opposed to mere oral allegations." Id. For the dissenters, these concerns and the practical implications of fabricated evidence rendered the difference between the two types of evidence to be "very real" and "significant." Id. They warned:
The potential for havoc and injustice resulting from allowing police to fabricate evidence to obtain confessions appears to be much greater than its potential benefits in obtaining otherwise unobtainable, valid confessions.
[Id. at 624.]
Finally, in Arthur v. Commonwealth, 24 Va.App. 102, 480 S.E.2d 749 (1997), the Virginia Court of Appeals, applying the totality of the circumstances test, held that a confession resulting from police showing defendant "dummy" reports indicating that defendant's fingerprints and hair were found at the crime scene was voluntary. Id. at 751. Although not discussing Cayward `s practical evidential concerns, the court did note that the "[p]olice [had] kept the false documents in a file separate from the actual investigative documents and lab reports." Id. Also, the court observed that defendant "did not immediately confess after being shown the `dummy' reports, but admitted his involvement only after the detective later told him that the victim's parents wanted to know why the killing had happened." Id. at 752. And, in addition to making the oral admission to the police and giving a taped and written statement, defendant "wrote a letter, in private, to the victim's parents." Id.
Other jurisdictions have permitted the use of fabricated evidence in procuring confessions. See, e.g., United States ex rel. Lathan v. Deegan, 450 F.2d 181 (2d Cir.1971) (upholding validity of confession from soldier where detective posed as Army colonel who "want[ed] to help [defendant]" as error was not brought up at trial, defendant did not immediately confess and defendant admitted he suspected detective was not an Army officer), cert. denied, 405 U.S. 1071, 92 S.Ct. 1520, 31 L. Ed.2d 803 (1972); Whittington v. State, 147 Md.App. 496, 809 A.2d 721 (2002) (upholding confession where police placed an invisible powder on a pen they gave to defendant to use so that when they later conducted a fake gun "blow back" test, it appeared to her that she still had gun powder on her hand), cert. denied, 373 Md. 408, 818 A.2d 1107 (2003); People v. Henry, 132 A.D.2d 673, 518 N.Y.S.2d 44 (N.Y.App.Div.1987) (upholding confession obtained after defendant was confronted with fake polygraph test results indicating that he had lied to police); State v. Von Dohlen, 322 S.C. 234, 471 S.E.2d 689, 694-95 (describing the police's actions as "reprehensible," but upholding confession obtained after police showed defendant an eyewitness composite sketch of himself actually drawn by police while observing him through a one-way mirror as defendant's will was not overborne by the trickery because he did not confess until an hour and a half later), cert. denied, 519 U.S. 972, 117 S.Ct. 402, 136 L.Ed.2d 316 (1996); cf. United States ex rel. Caminito v. Murphy, 222 F.2d 698 (2d Cir.) (suppressing confession where defendant was held incommunicado for forty hours and questioning whether it was acceptable for disguised police officers to make false identifications of defendant), cert. denied, 350 U.S. 896, 76 S.Ct. 155, 100 L.Ed. 788 (1955).
*798 Neither the majority in Bessey, nor the court in Arthur or the other cases allowing police to use fabricated evidence addressed the evidential concerns in Cayward, however, and these issues present serious questions in the context of this appeal. Cayward's observation that "such [fabricated] reports have the potential of finding their way into the courtroom," Cayward, supra, 552 So. 2d at 974, was prescient.
Here, as part of its case in chief, the State offered the police-fabricated audiotape to establish the context of defendant's confession and to satisfy its burden that the confession was voluntary. Both the State and defendant noted to the jury that the audiotape was created by the State and was apparently false. The flaw in the State's position and the relevance of the Cayward prediction surfaced when it became equally apparent that some of the information contained in the falsified audiotape was true. Defendant suddenly found himself in an untenable strategic dilemma. To cross-examine Inv. Falco would expose defendant to establishing the bona fides of information contained in the audiotape regarding "other bad acts" including involvement in domestic violence disputes.[5] Specifically, the audiotape contained inadmissible hearsay of prior bad acts by defendant, i.e., the domestic violence restraining order against him, and although one of the investigators who created the audiotape, Inv. Falco, was subject to cross-examination, asking the investigator whether the prior bad acts evidence was valid would have presumably prompted a truthful response that it was genuine. Everyone in the courtroom recognized that to give the audiotape credibility to defendant, it was necessary to "seed" the tape with some truth. Even the judge asked the prosecutor, rhetorically: "Would there not have to be something on that tape, counsel, to give a ring of truth to the defendant for him to think, `Gee, this is a genuine tape?'" The use of seemingly true hearsay statements generated an issue certainly not anticipated by Cayward, but very real here.
In State v. Bankston, 63 N.J. 263, 307 A.2d 65 (1973), the Court held that a police officer may explain at trial that he apprehended a suspect or went to a crime scene "upon information received" without violating the hearsay rule. Id. at 268, 307 A.2d 65 (quoting McCormick on Evidence, § 248 (2d ed.1972)). This testimony is admissible because it merely demonstrates that the officer was not acting in an arbitrary manner. The hearsay rule is violated, "[h]owever, when the officer becomes more specific by repeating what some other person told him concerning a crime by the accused ... [as] the admission of such testimony violates the accused's Sixth Amendment right to be confronted by witnesses against him." Id. at 268-69, 307 A.2d 65 (citations omitted).
In Bankston, police officers testified that they had spoken to an informant prior to arresting defendant, and based on the information given them, they went to a particular tavern. Then one of the officers stated, "[W]e were looking for a certain individual. We had a description of his clothing. He was inside the tavern.... We were looking for an individual that had narcotics in his possession." Id. at 266, 307 A.2d 65. Another officer testified that upon entering the tavern he had observed "four black males inside, `one of them fitting the description that we had obtained.' "Id. at 267, 307 A.2d 65. The Court found error stating:

*799 Although in the present case the police officers never specifically repeated what the informer had told them, the inescapable inference from [the first officer]'s testimony was that the informer had given information that defendant would have narcotics in his possession. Thus the jury was led to believe that an unidentified informer, who was not present in court and not subjected to cross-examination, had told the officers that defendant was committing a crime. The testimony was clearly hearsay.
[Id. at 271, 307 A.2d 65 (emphasis added).]
Here, the State introduced the police-fabricated audiotape containing allegedly fictitious hearsay information from an informant indicating that the victim had told the informant that she and defendant had argued on the day she was murdered and that he knew "Lora" who had told him that she had a domestic violence restraining order against defendant. Unlike in Bankston, Inv. Falco was subject to cross-examination. But, defendant knew the information was actually true (a representation accepted by the trial judge), and questioning Inv. Falco would have only exacerbated the problem of presenting this evidence to the jury. Because the jury was told that the police created the audiotape to persuade defendant to confess, there was a "reasonable inference" that the audiotape contained valid informationthat is, it had a "ring of truth"sufficient to convince defendant that there was an eyewitness who witnessed the shooting.
The judge's curative instructions neither prevented nor cured the error. See Bankston, supra, 63 N.J. at 272, 307 A.2d 65 (noting that trial judge's curative instructions, which only addressed the prosecutor's references to hearsay and did not reference the officer's hearsay testimony, "did not remove the prejudicial effect of that testimony from the minds of the jury."). The judge admonished the jury not to consider the audiotape as true, but limited his cautionary instructions to the restraining order; yet there was other information in the audiotape to be considered by the jury, including a hearsay rendition of an argument having taken place between defendant and the victim on the day of the murder.
But, there is a more fundamental problem caused by the use of this fabricated audiotape at trial. The fabricated audiotape provided a "road map" for the State's theory of the case: defendant had fought with the victim; defendant was violent towards women; defendant was associated with drug users; defendant had shot the victim in the back while she was running down the alley; and the "eyewitness" had communicated with the victim's brother. All of this was described through the use of hearsay, inadmissable as probative evidence and immune from challenge by defendant's cross-examination. Through the guise of this audiotape, the State presented a neatly packaged summary of its case in a form and manner that was inadmissable.[6]
We do not discuss the apparent errors caused by the use of the audiotape at trial as an independent basis for reversing the conviction. Our purpose is more focused.
*800 The objective of the fabricated audiotape was to elicit a confession. One of the evils identified in Cayward was potential for mischief if the fabricated evidence found its way into the trial. Of course, Cayward `s expressed concern did not predict all of the potential problems that could arise from future use of fabricated evidence. This case demonstrates another variation of mischief, a mischief that was palpable and impacted on the rights of defendant. The creation of the audiotape set in motion a confluence of events that tainted not only the interrogation process but the trial itself. This is too heavy a price to pay for eliciting the confession.
Ultimately, the admissibility of the confession must be considered within the scope of Constitutional principles. The Fifth Amendment to the United States Constitution establishes a privilege against self-incrimination. U.S. Const. amend. V; see State v. Presha, 163 N.J. 304, 312, 748 A.2d 1108 (2000). This right, although not found in the New Jersey State Constitution, "is firmly established as part of the common law of New Jersey, and has been incorporated into [New Jersey's] Rules of Evidence." Presha, supra, 163 N.J. at 312-13, 748 A.2d 1108 (quoting State v. Hartley, 103 N.J. 252, 260, 511 A.2d 80 (1986)) (quoting In re Martin, 90 N.J. 295, 331, 447 A.2d 1290 (1982)). A person may waive his or her right against self-incrimination and confess to the commission of a crime, but the police may not elicit such a waiver through coercion; and in such event, the prosecution is prohibited from admitting the confession as part of its case in chief. Presha, supra, 163 N.J. at 313, 748 A.2d 1108; Hartley, supra, 103 N.J. at 267, 511 A.2d 80. To admit a confession into evidence, the State "must prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances." Presha, supra, 163 N.J. at 313, 748 A.2d 1108 (citing State v. Burris, 145 N.J. 509, 534, 679 A.2d 121 (1996); State v. Kelly, 61 N.J. 283, 294, 294 A.2d 41 (1972)).
In determining whether a confession was coerced, a court will consider "whether a suspect's will has been overborne by police conduct." Id. To make this decision, "courts traditionally assess the totality of circumstances surrounding the arrest and interrogation[.]" Ibid. This analysis includes consideration of the characteristics of the suspect, including age, intelligence, education, and prior encounters with the law, as well as the conditions under which the questioning took place, i.e., whether it was "repeated and prolonged," the length of the suspect's detention, and whether "physical punishment or mental exhaustion was involved." Ibid. (quoting State v. Miller, 76 N.J. 392, 402, 388 A.2d 218 (1978)).
A critical factor in any analysis is the conduct of the police, conduct that if overreaching violates due process. In State v. Smith, 32 N.J. 501, 161 A.2d 520 (1960), cert. denied, 364 U.S. 936, 81 S.Ct. 383, 5 L.Ed.2d 367 (1961), our Supreme Court adopted the due process analysis for confessions set forth in Brown v. Mississippi supra. Smith, supra, 32 N.J. at 542-44, 161 A.2d 520 (upholding juvenile's confession to felony-murder obtained after police told juvenile that co-defendant confessed and his family and friends did not corroborate his alibi). Smith and subsequent New Jersey cases "impose[] a mandatory burden on all courts to test the admissibility of confessions not only by the ordinary rules of evidence, but by the deeper constitutional requirement of fundamental fairness." State v. Driver, 38 N.J. 255, 282, 183 A.2d 655 (1962) (invalidating confession to murder based on "intensive and prolonged" interrogation of defendant over nine days); see also State v. Pickles, 46 *801 N.J. 542, 577, 218 A.2d 609 (1966) (invalidating mother's inculpatory admission to child neglect because it "was extracted by basically unfair means" as she was questioned immediately after her son's funeral and her emotional state made her "an easy prey to interrogative pressure."); State v. Fauntleroy, 36 N.J. 379, 397, 177 A.2d 762 (1962) (setting aside murder conviction because trial judge only considered the police's five-day delay in arraigning defendant and provision of inadequate food and sleeping facilities during interrogation as mere "technical" violations that did not render defendant's confession inadmissible absent "brutality or misrepresentation."). And see State v. Roach, 146 N.J. 208, 226-28, 680 A.2d 634, cert. denied, 519 U.S. 1021, 117 S.Ct. 540, 136 L.Ed.2d 424 (1996) (upholding confession despite defendant's allegation that police deceived him into thinking he was only giving statement as a witness as there was no evidence that the statement "was not the product of `an essentially free and unconstrained choice.'") (quoting Pickles, supra, 46 N.J. at 577, 218 A.2d 609). These cases mandate an appellate review of police-obtained confessions that is "searching and critical." Pickles, supra, 46 N.J. at 577, 218 A.2d 609; Smith, supra, 32 N.J. at 544, 161 A.2d 520 ("We must ever be alert, however, that recognition is not mere lip service. Review [of the fundamental fairness of a confession] has to be both wide and penetrating to make sure these constitutional rights have not been trampled upon.").
More recently, our Supreme Court alluded to the analysis for whether police conduct violates due process in State v. Reed, 133 N.J. 237, 269, 627 A.2d 630 (1993), where the Court established the rule that to satisfy Miranda's requirement of a knowing waiver, police officers must inform a suspect in their custody if an attorney has been retained and is available for the suspect. The Court said:
[T]he police conduct in this case illustrates the close correlation between police conduct that can increase the inherently coercive atmosphere of custodial interrogation and conduct that is excessive, shocking, and fundamentally unfair and therefore violative of due process.
[Id. at 268, 627 A.2d 630.]
But see Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (holding that the failure of police to inform defendant that an attorney was available to assist him did not violate his Fourth, Fifth or Sixth Amendment rights as he had knowingly and voluntarily waived his Miranda rights).
In Reed, the Court noted that other jurisdictions had similarly banned such police conduct, although courts differed in their rationales for imposing a duty to inform; even so, the one "supervening principle" that all the courts agreed on was that: "the atmosphere of custodial interrogation is inherently coercive and protecting the right against self-incrimination entails counteracting that coercion." Reed, supra, 133 N.J. at 255, 627 A.2d 630. The "lesson" that the Court derived from the differing analysis was that "a waiver of the right against self-incrimination which, by all subjective indicia, appears knowing, intelligent, and voluntary, may still be deemed invalid when elicited in an atmosphere of coercion." Id. at 256, 627 A.2d 630. The Court explained that "the determination of the subjective mental state that leads to a waiver is often so problematic," id., referring to a study demonstrating that people differ widely in their ability to resist pressure. Id. at 257, 627 A.2d 630 (citing George Thomas III, Justice O'Connor's Pragmatic View of Coerced Self-Incrimination, 13 Women's Rts. L. Rep. 117 (1991)); see also Welsh S. White, Police Trickery in Inducing Confessions, *802 127 U. Pa. L.Rev. 624-25 (Jan. 1979) (noting that "[t]he psychological pressures of custodial interrogation undoubtedly weaken the defenses of many criminal suspects," as social psychological "evidence indicates that when an individual finds himself disagreeing with the unanimous judgment of others regarding an unambiguous stimulus, he may yield to the majority even though this requires misreporting what he sees or believes.'") (quoting Edwin D. Driver, Confessions and the Social Psychology of Coercion, 82 Harv. L.Rev. 42, 51-52 (Nov.1968)).
The Court therefore adopted a bright-line, per se rule, rejecting a totality of the circumstances approach "because it is not feasible to determine defendant's subjective state of mind. The inherently coercive nature of incommunicado interrogations argues in favor of a clear principle to safeguard the presumption against the waiver of constitutional rights." Reed, supra, 133 N.J. at 265, 627 A.2d 630 (citation omitted). The Court specifically did not ground its decision on the Sixth Amendment to the United States Constitution in light of Moran v. Burbine, id. at 263, 627 A.2d 630, but noted that its "determination of the nature and application of the ancillary right to counsel directs the focus of future judicial inquiry, in [New Jersey], away from the assessment of the subjective level of coercion to which a suspect was exposed and toward an evaluation of objective police conduct," noting that "such a focustoward police conductinvariably raises questions of due process." Id. at 267, 627 A.2d 630. This due process inquiry involves "considerations of reasonableness, fairness, and judicial integrity that collectively define the bounds of tolerable police conduct." Id. at 268, 627 A.2d 630.
Reed suggests that New Jersey courts have been less tolerant of aberrant police conduct when applied to custodial interrogations than the United States Supreme Court, determining such issues with due process considerations at the fore. We need not dwell on whether such conflict exists here as we view the police conduct to be so inappropriate that it cannot be tolerated or withstand scrutiny under any constitutional or common-law principles. Nevertheless, we need only conclude that the conduct here violates New Jersey's due process standards.
As demonstrated in Reed, the "totality of circumstances" test is not without limits. Certain interrogation techniques are so inappropriate that application of a totality of the circumstances test is inadequate to assure that the resultant confession was voluntary, and the use of the technique renders the confession per se inadmissible. See also Presha, supra, 163 N.J. at 315-16, 748 A.2d 1108 (holding that any confession resulting from the interrogation of a juvenile under fourteen years old whose parent or guardian is available but not present is inadmissible as a matter of law); Hartley, supra, 103 N.J. at 256, 511 A.2d 80 (holding that police must furnish a suspect who has asserted his right to silence with a fresh Miranda warning before resuming custodial interrogation of the suspect or any resulting confession is inadmissible as a matter of law).
Applying the principles set forth in Reed, Hartley, and Presha, we hold that the circumstance presented here, the fabrication of evidence by police to elicit a confession and admission of that evidence at trial, violates due process, and any resulting confession is per se inadmissable.[7] *803 Although the United States Supreme Court has yet to define the permissible limits of police trickery, we are informed by another post-Miranda decision of our Supreme Court, which noted:
The necessity for our giving guidance to our own law-enforcement officials cannot be underestimated. We are faced with a situation similar to that presented in State v. Deatore, 70 N.J. 100, 358 A.2d 163 (1976). When we decided that case, the United States Supreme Court had not yet ruled on whether a defendant's post-arrest silence could be used on cross-examination to undercut an "alibi" defense. Recognizing the importance of this issue to our state's criminal justice system, as well as the confusing "disarray in decisional treatment of the question," we ruled as a matter of state law that such cross-examination was improper. 70 N.J. at 112, 358 A.2d 163. Our concern with the effective administration of our state criminal-justice system has led us in other circumstances to create or enforce criminal defendants' rights under our supervisory power, N.J. Const, of 1947 art. VI, § 2, para. 3, when the scope of federal constitutionally-required protection was unclear. See, e.g., State v. Gregory, 66 N.J. 510, 333 A.2d 257 (1975) (adopted "same transaction," compulsory-joinder rule to prevent double jeopardy); Rodriguez v. Rosenblatt, 58 N.J. 281, 277 A.2d 216 (1971) (indigent defendants not to be subjected to conviction entailing imprisonment or other consequence of magnitude without first having had fair opportunity to have counsel appointed).
[Hartley, supra, 103 N.J. at 285, 511 A.2d. 80.]
Hence, as there is no established boundary for permissible police trickery during custodial interrogation, it is imperative that a clear rule be established.
Over seventy years ago, the Wickersham Report expressed a series of concerns that provided a policy foundation for the Miranda decision, concerns that remain timely. In criticizing police conduct in extracting confessions through the use of the third degree, the authors of the report observed: (1) "[i]t is not admissible to do a great right by doing a little wrong," (2) such practice "involves also the dangers of false confessions, [(3)] it tends to make police and prosecutors less zealous in the search for objective evidence," and (4) it "lowers the esteem in which the administration of justice is held by the public." Miranda, supra, 384 U.S. at 447-48, 86 S.Ct. at 1614, 16 L.Ed.2d at 708 (quoting Wickersham Report, supra, at 5).
The admonitions of that report and the decisional law following has not been lost on police training. In fact, the actions here were not in conformity with standard police interrogation practices described in the "Inbau Manual," Fred E. Inbau et al., Criminal Interrogation and Confessions (4th ed.2001), an interrogation manual used by many police departments. See Welsh S. White, What Is An Involuntary Confession Now?, 50 Rutgers L.Rev. 2001, 2004 (Summer 1998) (describing the Inbau Manual as "the leading interrogation manual"); Yale Kamisar, What is an `Involuntary' Confession? Some Comments on Inbau and Reid's Criminal Interrogation and Confessions, 17 Rutgers L.Rev. 728 (1963); see also Miranda, supra, 384 U.S. at 449 n. 9, 86 S.Ct. at 1614 n. 9, 16 *804 L.Ed.2d at 709 n. 9 (discussing prior edition of Inbau Manual as having "rather extensive use among law enforcement agencies and among students of police science, with total sales and circulation of over 44,000."). The Inbau Manual recommends the use of trickery, including "outright lies concerning the existence of evidence." Inbau Manual, supra, at 428. It reaches a different recommendation regarding the creation of "false incriminating documents," however. Id. at 217 n. 2. Specifically, the Inbau Manual advises:
Before entering the interview room, the investigator should prepare and have on hand an evidence case folder, or a simulation of one. Then, at the outset of the interrogation, and also at appropriate times during the various steps that follow the initial confrontation, the investigator can make visual reference to the evidence folder. This is to lead the suspect to believe that the folder contains information and material of incriminating significance, even though, in fact, the file may contain nothing but blank sheets of paper. The mere sight of the file has a desirable effect on both guilty and innocent suspects because of the impression of preparedness on the part of the investigator.
In addition to an evidence file, depending on the nature of the case, the investigator may consider bringing into the interview room other visual props, such as video or audio tape, a fingerprint card, an evidence bag containing hair or other fibers, spent shell casings, vials of colored liquid, and others. No verbal reference needs to be made at all concerning these items of apparent physical evidence. The visual impact of seeing the implied evidence can have a desirable effect on a guilty suspect.

[Id. at 217 (footnote omitted).]
Despite its instruction to use props during an interrogation, the Inbau Manual precludes the use of fabricated evidence. It explains:

The investigator, however, should not prepare false incriminating documents that appear to have been generated through an official source (for example, a crime lab, the FBI). The reason for this is a concern that such falsified documents may find their way into the court system, see State v. Cayward, 552 So. 2d 971 (Fla.Dist.Ct.App.1989).

[Id. n. 2 (emphasis added).]
We hold that law enforcement and the public would best be served by a "bright-line" rule precluding the use of police-fabricated evidence that later finds its way into the trial. Such "bright-line" rules serve to protect the constitutional rights of suspects while providing a clear procedure for police to follow that should produce consistent results. Presha, supra, 163 N.J. at 316, 748 A.2d 1108; Hartley, supra, 103 N.J. at 287, 511 A.2d 80.
We recognize that the rule here invalidates a confession to a murder, yet on balance, the sanctity of our constitutional protections for all remains paramount. As a noted jurist observed: "The quality of a nation's civilization can be largely measured by the methods it uses in the enforcement of its criminal law." Walter V. Schaefer, Federalism and State Criminal Procedure, 70 Harv. L.Rev. 1, 26 (Nov. 1956), quoted in Miranda, supra, 384 U.S. at 480, 86 S.Ct. at 1631, 16 L. Ed.2d at 727. His cogent observation was echoed by the former Director of the Federal Bureau of Investigation who said:
We can have the Constitution, the best laws in the land, and the most honest reviews by courtsbut unless the law enforcement profession is steeped in the democratic tradition, maintains the highest in ethics, and *805 makes its work a career of honor, civil liberties will continuallyand without endbe violated.... The best protection of civil liberties is an alert, intelligent and honest law enforcement agency. There can be no alternative.
[J. Edgar Hoover, Civil Liberties and Law Enforcement: The Role of the FBI, 37 Iowa L.Rev. 175, 177 (1952), quoted in Miranda, supra, 384 U.S. at 483 n. 54, 86 S.Ct. at 1633 n. 54, 16 L.Ed.2d at 729 n. 54.]
The promulgation of a per se rule validates these common interests.
In sum, we hold that the use of police-fabricated evidence to induce a confession that is then used at trial to support the voluntariness of a confession is per se a violation of due process. We deem it in the same class and nature as the physical coercion interdicted by Brown v. Mississippi, supra, the psychological coercion prohibited in Spano v. New York, supra, and the very concerns identified by the Wickersham Report as early as 1931. The trial judge erred in denying the motion to suppress.

II.
We next address the propriety of the stop, search and arrest of defendant after receipt of the anonymous tip. Our consideration of the issue requires a further expansion of the factual premise for the judge's determination that the stop was proper. These are the facts.
At 8:19 p.m. on August 10, the police received an anonymous tip that "a black male dressed in dark clothing" was walking near the Centennial Village apartments and was "[a]rmed with a gun and possibly related to the killing the night before." Officer Mark Toscano of the tactical unit of the Camden Police Department arrived at the scene within minutes. He described the stop of defendant:
Q. When you got to the area, where did you pull your car up?
A. I pulled my car into Centennial Village, into the center portion. Then Sergeant Merrick called on the radio and said he saw a person walk away from the scene that matched the description.
Q. Okay. Was Sgt. Merrick in a different location than you were when he was giving this information?
A. Yes. He was in the front of Centennial Village by a parking lot that runs parallel with East State Street.
Q. So after getting the radio call from Sgt. Merrick, what did you do?
A. I pulled over, turned around and went back out towards State Street and pulled into the parking lot.
Q. And when you pulled into the parking lot, did you see anyone that drew your particular attention?
A. Yes, ma'am. I saw a black male in dark clothing walking away across the parking lot towards [the] Tenth Street bridge.
Q. Did you see any other pedestrians in that area?
A. No, there was no one else.
Q. And what did you do at that point?
A. At that point, I called out the window something to the words of, "Hey, let me talk to you a second."
Q. Okay. Did this male that you saw walking away respond in any way?
A. No.
Q. Did he look around at all?
A. No.
Q. After you called out the window, "hey, let me talk to you" or whatever it was, what was the next thing you did?
*806 A. When I didn't get a response, I turned my spotlight on him.
Q. Were you still in your car at this point?
A. Yes, ma'am.
Q. And when you say you turned your spotlight on, how far away was the male from your car at that point?
A. Approximately thirty feet. Little bit further than where the benches are.
Q. Okay. Can you just describe the spotlight and how much of an area around this man it illuminated?
A. It illuminated the person real bright. It's about 70,000 candlepower.
Q. When you put the spotlight on this male, did you say anything at that point?
A. I told him, I"stop, let me talk to you," and I didn't get a response.
Q. When you say no response, did the male even look around?
A. No. He walked straight ahead.
Q. Again, at that point was there anybody else in the immediate vicinity you could have been yelling out to?
A. No.
....
Q. After attempting to stop the male verbally twice and also with the spotlight the second time and getting no response, what did you do?
A. I stopped my car and positioned it [to] give me some cover. Sgt. Merrick pulled up a little further and exited the car and commanded him to stop, at which point the suspect did stop.
Q. So let me ask you this. When you say both you and Sgt. Merrick pulled up, Sgt. Merrick was a little bit in front of you?
A. Yes.
Q. At the point you pulled up, the male's back would have been to your car?
A. He was facing away from me.
Q. Facing away from you. How was he facing in relation to Sgt. Merrick?
A. When Sgt. Merrick issued this challenge, he turned a little bit towards Sgt. Merrick.
Q. Okay. And when you say Sgt. Merrick commanded him to stop, what did he do besides telling him to stop?
A. He drew his weapon and pointed it at him.
Q. And you say at this point the man did stop?
A. Yes.
Q. Okay. What did you do at that point?
A. At that time, I nodded over to Sgt. Merrick. We work together. He's on the tac [tactical] force. He's my sergeant. He knew I was going to go up and pat him down. As soon as I went up and grabbed him by his hand, [I] put my hands on his waist. I immediately felt a gun. I recognized immediately he had a gun.
Officer Toscano admitted that defendant had not committed any crime prior to Toscano discovering the gun on defendant. Defendant was arrested at approximately 8:30 p.m. and taken to the police station.
In his decision upholding the stop and arrest, the judge relied on our decision in State v. Sharpless, 314 N.J.Super. 440, 715 A.2d 333 (App.Div.), certif. denied, 157 N.J. 542, 724 A.2d 802 (1998), and concluded that under the "totality of the circumstances, for their own safety, certainly the officers had a right to pat-down the defendant." *807 Although not stating his view as such, the judge seemingly relied on Sharpless as articulating a "man with a gun" exception that would permit a stop of an individual whose other actions appeared entirely lawful.
As we noted in State v. Goree, 327 N.J.Super. 227, 240-42, 742 A.2d 1039 (App.Div.2000), Sharpless involved other furtive behavior occurring before the search that corroborated the "man with a gun" anonymous tip and provided the requisite "reasonably articulable suspicion" to warrant a stop and frisk under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Also, subsequent to the denial of the motion to suppress, the Supreme Court of the United States decided Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), wherein the Court eschewed the "man with a gun" rule as providing a sufficient basis for prompting a Terry stop.
Although defendant here moved for reconsideration of the denial of his suppression motion based on J.L., the trial judge never had the opportunity to address the application of J.L. in the context of this case because defendant withdrew the motion.[8] We have commented since the decision in J.L. that the anonymous tip cases involving guns and drugs "are close and difficult, waffling about in a `no-man's land' of nuances." State v. Richards, 351 N.J.Super. 289, 306, 798 A.2d 136 (App. Div.2002) (quoting Goree, supra, 327 N.J.Super. at 244, 742 A.2d 1039). This is another of those nuanced cases, and neither the "nuances" nor the application of J.L. were previously addressed. Additionally, the State offers that this is not an "anonymous tip" case, which a careful reading of the record suggests may be accurate. At the hearing on the motion to suppress, the officer never identified the source of the information as an anonymous tip, that information was offered in colloquy by the prosecutor and later found its way into the fact-finding by the judge.
Even assuming that the information emanated from an anonymous tip, the tip referred to a murder and contained more than the information described in J.L., Goree or Richards as there was reference to a murder as well. Cf. State v. Golotta, 354 N.J.Super. 477, 808 A.2d 135 (App.Div. 2002) (upholding suppression where an anonymous tip described erratic driving and the police officers who stopped defendant did not observe such conduct), certif. granted, 176 N.J. 70, 819 A.2d 1186 (2003). Whether such information is of any moment or reflects the "nuances" referred to in Richards and Goree should be addressed in the first instance by the trial judge on remand. This should be accompanied by a full record including the details of the information transmitted to the police. We would be remiss if we did not question the propriety of the State's minimalist approach in meeting its burden in this case by suggesting in the first instance that the stop resulted from an anonymous tip and thereafter suggesting the availability of more profound proofs to meet its burden.

III.
Because we reverse the motion to suppress and remand for a new trial, we need not address defendant's arguments as to either the waiver of a jury on the charge of a violation of N.J.S.A. 2C:39-7 or the propriety of defendant's sentence.

*808 IV.
We recognize that our decision barring the use of fabricated evidence effectively denies the right of the State to use defendant's confession to a murder. However, adherence to constitutional precepts cannot cease simply because the result is unfavorable to law enforcement or, as the trial judge opined, because "a confession often minimizes the need for further police investigation and often leads to conviction, both of which reduce costs to taxpayers." There is a more significant principle at stake: due process. The United States Supreme Court recognized the issue when it observed:
The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves. Accordingly, the actions of police in obtaining confessions have come under scrutiny in a long series of cases. Those cases suggest that in recent years law enforcement officials have become increasingly aware of the burden which they share, along with our courts, in protecting fundamental rights of our citizenry, including that portion of our citizenry suspected of crime. The facts of no case recently in this Court have quite approached the brutal beatings in Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936), or the 36 consecutive hours of questioning present in Ashcraft v. State of Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944). But as law enforcement officers become more responsible, and the methods used to extract confessions more sophisticated, our duty to enforce federal constitutional protections does not cease. It only becomes more difficult because of the more delicate judgments to be made.
[Spano v. New York, supra, 360 U.S. at 320-21, 79 S.Ct. at 1205-06, 3 L.Ed.2d at 1270-71 (1959) (footnote omitted).]
The rule we enunciate here reflects one of those "delicate judgments" but recognizes that constitutional protections cannot be compromised by actions that go beyond the bounds of lawful conduct and in the end truly threaten our society's reliance on a rule of law. We recognize that criminal investigations are not to be conducted on a level playing field. The public interest demands a "tilt" in favor of law enforcement, and the judicial sanctioning of the limited use of police trickery provides such an advantage. But the "tilt" can never become so severe that the Constitution loses its balance. This is what happened here.
Reversed and remanded for a new trial consistent with this opinion.
NOTES
[1] The circumstances of the arrest and the issues raised in that regard are discussed, infra, at Section II.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] "A.M." refers to Inv. Marcial and "F.F." refers to Inv. Falco.
[4] "Third degree" is defined as: "[T]he subjection of a prisoner to mental torture (as continuous questioning over excessively long periods) or physical torture (as restriction to a meager diet or deprivation of sleep) in an effort to wring a confession from him." Webster's Third New International Dictionary 2378 (1981).
[5] Although a review of the audiotape transcript inferred that the domestic violence victim was Hoke, that apparently was not so as the alleged victim was another person involved with defendant.
[6] We deem the trial judge's distinction between Florida and New Jersey evidence practice as irrelevant to any analysis of the propriety of the fabricated evidence. The fabricated evidence was admitted at trial and generated the problems that we have described here. We likewise reject without further comment the State's argument that any error caused by the playing of the audiotape was harmless as the evidence was admitted elsewhere. At a minimum, the duplication of such evidence only bolstered the information on the fabricated audiotape and amplified the harm.
[7] Even if we applied a totality of circumstances test, we would reach the same result. Defendant was held for nineteen hours before questioning; the jail admission form suggested heroin withdrawal; the confession came immediately after defendant heard the fabricated audiotape, see State v. Cooper, supra, 151 N.J. at 355, 700 A.2d 306 ("[A] misrepresentation by police does not render a confession or waiver involuntary unless the misrepresentation actually induced the confession."); the entire interrogation lasted less than one hour; and the confession was prompted by police-fabricated evidence.
[8] We reject, without the necessity of further comment, the State's argument that the withdrawal of the motion for reconsideration was a waiver of this issue on appeal. R. 2:11-3(e)(2).