**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1459-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CHARLES M. GRANT, a/k/a
CHARLES GRANT, III,

    Defendant-Appellant.

_____

Argued January 13, 2025 – Decided July 25, 2025

Before Judges Gummer and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 15-12-1007.

Rachel E. Leslie, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Austin J. Howard, Assistant Deputy Public Defender, of counsel and on the brief).

Lauren P. Haberstroh, Assistant Prosecutor, argued the cause for respondent (Camelia M. Valdes, Passaic County Prosecutor, attorney; Lauren P. Haberstroh, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

In 2018, a jury convicted defendant Charles M. Grant of first-degree purposeful or knowing murder, N.J.S.A. 2C:11-3(a)(1) and (2); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a); and second-degree unlawful possession of a firearm, N.J.S.A. 2C:39-5(b). The trial court sentenced defendant to life imprisonment with an eighty-five percent period of parole ineligibility as required by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

This court reversed the convictions and remanded the case for a new trial because defendant had been deprived a fair trial when the trial court allowed the jury to view portions of his videotaped interrogation in which the interrogating officer, Patterson Police Department Detective James Maldonado, impermissibly offered opinions on defendant's guilt and credibility and made statements that "amounted to prior bad acts evidence." State v. Grant, No. A-1401-18 (App. Div. Feb. 15, 2022) (slip op. at 27, 35). In that opinion, we set forth in detail the evidence presented at trial, summarizing it as follows:

> Isaac "Blaze" Tucker was fatally shot at close range in the middle of the night on a street in Paterson. There were no witnesses. The only direct evidence presented against defendant was surveillance videos that recorded

2

the shooting and tracked Tucker with another person walking to the location of the shooting, and the testimony of Tucker's friend, Demetrius Robinson, who claimed that defendant admitted to the murder days after it occurred.

[Id. at 2.]

We held the trial court had erred both in allowing the impermissible portions of the interrogation video to be shown to the jury and in failing to issue appropriate limiting instructions. Id. at 26-27. We also held those errors were "compounded by the prosecutor's summation, which asserted that Maldonado knew that defendant was lying based on the evidence he saw." Id. at 26. Concluding the errors committed were not harmless, we described the evidence against defendant as "not overwhelming" and as "hing[ing] on Robinson's credibility, which was subject to attack, and the poor quality of the surveillance videos." Id. at 27.

At the second trial in 2022, the State presented undisputed evidence that at about 2:15 a.m., on February 23, 2015, the Paterson Police Department had been alerted to gunfire via "ShotSpotter" technology used by the city to detect gunshots. Responding officers found Tucker's body at 296 East 16th Street, along with shell casings and a bottle of liquor nearby. According to the State's theory of the case, on the night of the shooting, defendant and Tucker were at

3

the Alto Rango Lounge, they left together, and defendant shot and killed Tucker. The Alto Rango Lounge is located on East 12th Avenue, which turns into East 16th Street, where Tucker's body was found. Defendant presented a mistaken-identity defense. Defendant did not testify at trial, but during the interrogation he admitted he and Tucker were at the Alto Rango Lounge and had left together, claiming they parted company when defendant turned off of East 16th Street onto Governor Street, where he lived, and Tucker continued walking on East 16th Street.

Several law-enforcement officers testified on behalf of the State. The State also presented a redacted video of defendant's interrogation and series of surveillance videos taken by different cameras located in the neighborhood the night of the shooting that tracked Tucker with another person walking to the location of the shooting and showed flashes presumably of the shooting. An expert witness "in the area of ballistic evidence and firearm identification" testified on behalf of the State. He opined a Glock pistol had fired the shell casings discovered near the victim's body. The State presented a forensic DNA expert who testified suspected blood samples found on a walkway did not produce any human DNA.

Robinson again testified, but his testimony differed significantly from the testimony he had given in the first trial. At the first trial,

> Robinson testified that on March 5, 2015, he and defendant were drinking at the location of the shooting, which had been turned into a shrine for Tucker, who Robinson said had been his best friend. At one point, defendant spat on the shrine and kicked it. Robinson asked defendant what he was doing, and defendant told him to mind his own business, shoved him, pulled out a black "Glock," and pointed it at Robinson's face. Robinson swatted it away and ran down the street. As he ran, he heard defendant say that "he was going to kill [him] like he had killed Blaze."
>
> [Id. at 6-7 (alteration in original).]

When asked at the second trial who had been involved in the shrine "incident," Robinson responded, "I don't feel safe enough to speak about it, sir." He subsequently admitted he and defendant had been involved in an "incident" that day at the shrine. When asked if he had witnessed defendant kicking and spitting on the shrine, Robinson initially testified that he did not recall. After his recollection was refreshed with a transcript of his previous testimony, Robinson recalled testifying about defendant spitting and subsequently producing a Glock firearm. He stated he did not "want to answer anything else" about what he and defendant then discussed but admitted he previously had testified that they

5

discussed something. He testified that after he was arrested on a gun charge, he had told police he had a firearm "[t]o protect [him]self."

The jury convicted defendant of first-degree purposeful or knowing murder, N.J.S.A. 2C:11-3(a)(1) and (2), and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a), and acquitted him of second-degree unlawful possession of a firearm, N.J.S.A. 2C:39-5(b). Defendant again received a life sentence subject to NERA. The trial court issued a judgment of conviction dated January 4, 2023. Defendant appeals the convictions and resulting sentence.

In his counseled brief, defendant makes the following arguments on appeal:

> POINT I
>
>> REVERSAL IS REQUIRED BECAUSE THE TRIAL COURT FAILED TO COMPLY WITH THIS COURT'S PRIOR REMAND ORDER MANDATING COMPLETE REDACTION OF THE INTERVIEWING DETECTIVE'S LAY OPINIONS ON DEFENDANT'S GUILT AND CREDIBILITY. (Not Raised Below)
>
> POINT II
>
>> MULTIPLE INSTANCES OF PROSECUTORIAL MISCONDUCT DENIED DEFENDANT A FAIR TRIAL. (Not Raised Below)

6

A. The Prosecutor Essentially Testified in Summation About Several Previously Unexplored Portions of the Surveillance Videos, Depriving Defendant of His Right to Cross-Examine Those Claims.

B. The Prosecutor Essentially Testified in Summation About the Plea-Agreement Process, Bolstering the State's Theory that the Police Informant Received No Benefit from Testifying Against Defendant.

C. The Prosecutor's Summation Unfairly Bolstered the Credibility of the State's Police Informant -- Its Key Fact Witness.

D. The Prosecutor's Opening and Closing Arguments Unfairly Vouched for the Thoroughness and Competence of the Police Investigation.

E. The Prosecutor's Unnecessarily Graphic Opening and Closing Arguments -- Including Comparison to the Mobsters in "Goodfellas" -- Improperly Urged the Jury to Convict Based on Emotion, Rather than the Evidence.

POINT III

THE TRIAL COURT DEPRIVED DEFENDANT OF HIS RIGHT TO BE PRESENT AND TO HAVE COUNSEL AT A CRITICAL STAGE OF THE TRIAL JUST BEFORE JURY DELIBERATIONS BEGAN, RESULTING IN THE COURT FAILING TO PROVIDE THE JURY WITH A CRITICAL DEFENSE EXHIBIT. (Not Raised Below)

7

POINT IV

THE CUMULATIVE EFFECT OF THE NUMEROUS TRIAL ERRORS DENIED DEFENDANT A FAIR TRIAL. (Not Raised Below)

POINT V

ALTERNATIVELY, DEFENDANT'S LIFE SENTENCE IS EXCESSIVE AND REQUIRES A RESENTENCING.

In a supplemental pro se brief, defendant raises these additional issues:

POINT I

GRANT WAS DENIED THE RIGHT TO A FAIR TRIAL, BY THE PATERSON POLICE INADEQUATE INVESTIGATION. WHEN EVIDENCE SHOULD HAVE [TAILORED] THE INVESTIGATION TOWARDS OTHER POSSIBLE SUSPECTS. THE OTHER TWO SUSPECTS INSIDE ALTO RANGO, AND THE FLEEING SUSPECT. AS WELL AS THE VEHICLE MURDER VICTIM STOP[PED] TO COMMUNICATE WITH AT GOVERNOR STREET AND 16TH STREET. (Not Raise[d] Below)

POINT II

REVERSAL IS REQUIRED BECAUSE THE STATE PERPETRATED [A] "FUNDAMENTAL MISCARRIAGE OF JUSTICE[.]" GRANT['S] CREDIBLE SHOWING OF ACTUAL INNOCENCE, PROVES THE STATE PRODUCE[D] NO

8

A-1459-22

EVIDENCE INCRIMINATING GRANT. THE STATE HAD [A] DESCRIPTION OF THE KILLER IN VIDEO AND OFFICER KLEIN SEEN KILLER. THE CLOTHING IN VIDEO W[AS] ABSOLUTELY DISSIMILAR FROM MR. GRANT'S. (Not Raise[d] Below)

POINT III

THE TRIAL COURT SHOULD HAVE ENTERED A JUDGMENT OF AQUITTAL NOTWITHSTANDING THE VERDICT OR FOR A NEW TRIAL ON BEHALF OF DEFENDANT AS NO REASONABLE JURY COULD HAVE FOUND DEFENDANT GUILTY (Not Raised Below)

POINT IV

THE TRIAL JUDGE ERROR FOR NOT INSTRUCTING JURY ON ADVERSE INFERENCE, BECAUSE PATERSON POLICE, AND STATE FAILURE TO RECOVER, ENHANCE VIDEO OF SHOOTING, WEAPON, LICENSE PLATE IDENTIFICATION (BLACK CAR) VIDEO, TWO MALES (ALTO RANGO) IDENTIFICATION, FOOTPRINTS OF FLEEING SUSPECT, CLOTHING OF DEFENDANT AND VICTIM TO CHECK FOR GUNPOWDER RESIDUE MATCH. (Not [R]aised Below)

Convinced defendant was again deprived of a fair trial due to the trial court's failure to ensure redaction of certain comments of the interrogating detective and failure to provide a limiting instruction regarding his comments

A-1459-22

and the prosecutor's comments in summation about a witness's plea agreement, we are constrained to vacate the convictions and remand for proceedings consistent with this opinion.

I.

Defendant first contends the trial court failed to fully comply with our 2022 opinion regarding the redactions of the interrogation video, thereby improperly permitting the jury to hear the interrogating officer "repeatedly accuse [defendant] of lying and of killing Tucker."

At trial, the State introduced the redacted video footage of defendant's interrogation when Detective Audrey Adams was on the stand. Detective Adams had been present at the interrogation with Detective Maldonado. Detective Maldonado did not testify because he was on administrative leave. Before playing the video for the jury, counsel met with the court in chambers but on the record. Referencing our 2022 decision, the prosecutor informed the court the video had "been heavily redacted" as a result of different rounds of redaction and had been shared and viewed by defense counsel and defendant, with the State having agreed to and having made defendant's additional suggestions for redactions. He further stated his belief that "all parties [were] in agreement . . . that [the video] satisf[ied] the Appellate Division's concerns from [the] last

trial." Counsel for defendant confirmed that information and represented that "to [his] knowledge this video ha[d] no issues and . . . [was] squarely in line with the Appellate Division opinion."

Without viewing the redacted video, which was twenty-one minutes and thirty-eight seconds in length, the court indicated the State could present it to the jury. Especially considering we had remanded the case for a new trial because of improper commentary on the interrogation video, the better course would have been for the trial court to view the redacted video before it was shown to the jury. See, e.g., State v. Cotto, 471 N.J. Super. 489, 533 (App. Div. 2022) (noting the record showed "the trial judge, defense counsel, and prosecutor carefully went through the transcript of the electronically-recorded interrogation to identify portions that needed to be redacted from the version that was to be played to the jury").

After initially experiencing some technical difficulties with the audio of the video, the State restarted the video from the beginning. The video was paused at the three-minute and fifty-three second mark when defense counsel asked to be heard. Outside the presence of the jury, defense counsel asserted the State had just played "two lines" about "who got shot, who got stabbed, and you're an OG out there" that were supposed to be redacted from the video. The

prosecutor did not deny those lines were supposed to be redacted and suggested a mix up may have occurred when "the IT people had cut into it."  The parties agreed to tell the jury they were still having technical difficulties and to break for lunch.  Without instructing the jury to disregard what it had heard, the court advised the jury "[t]here was one additional technical glitch" the parties would address during the lunch break and dismissed the jury for lunch.

After the lunch break and before the jury returned, counsel confirmed with the court they had reviewed the redacted video and that it "appear[ed] to be in conformity with . . . [their] agreement" and could be played for the jury.  The jury returned, and the full redacted video was played from the beginning.  The court did not give any instructions to the jury about the video.  Ibid.  Defendant did not make any additional objections to the video or to its admission into evidence.

The only instruction the court gave to the jury regarding the video during the jury charge was:

> I instruct you that in this case certain portions of the recorded statement have not been provided to you.  You may only consider these portions of the statement which had been admitted in evidence and must not speculate as to the contents of the omission or the reason or reasons for the omission.

During their deliberations, the jury requested that certain videos be replayed for them, including the interrogation video. After the videos were replayed for them, the court instructed the jury "to consider all of the evidence presented and not . . . give undue weight to the videos played back."

On appeal, defendant argues that, despite the parties' redaction efforts, the video seen by the jury in the second trial "contained many of the very same flaws that this [c]ourt already held were improper," including Detective Maldonado's "improper opinions on Grant's 'credibility and guilt.'" Defendant complains the video was prejudicial in that it included: Detective "Maldonado assert[ing] his belief that [defendant] did not turn onto Governor [Street] . . . but that he instead kept walking 'past Governor' and 'past Lafayette'"; his opinion defendant was lying about his alibi; the use of language in the video implying Detective Maldonado had "superior knowledge" leading him to conclude defendant was the shooter; and his assertions defendant had killed Tucker and, despite defendant's denials, questioning defendant why he had killed him.

Defendant cites specific portions of the video he argues improperly revealed the detective's opinion defendant was lying about turning onto

13

Governor Street and lying about not shooting Turner despite "all that evidence" in front of him, emphasizing the statements as noted[1]:

> MALDONADO: You sure you didn't walk past Governor with him?
>
> GRANT: I walked to – (indiscernible).
>
> MALDONADO: You walked up – you didn't go past Governor?
>
> GRANT: No.
>
> MALDONADO: One hundred percent sure?
>
> GRANT: Yeah.
>
> MALDONADO: A hundred percent?
>
> GRANT: Uh-huh.
>
> MALDONADO: Or you just don't remember?
>
> GRANT: I remember I walked up Governor.
>
> MALDONADO: <u>What if I told you, you walked past Governor.</u>
>
> . . . .
>
> MALDONADO: <u>So what happened when you go past Lafayette Street</u>?

---

[1] The parties did not provide a transcript of the redacted interrogation video as it was played to the jury. We take the quotes that follow from defendant's merits brief. The State does not challenge the accuracy of defendant's quotes.

A-1459-22

GRANT:  I wasn't on Lafayette Street?

MALDONADO:  You were not there?

GRANT:  Uh-uh.

MALDONADO:  Well you were -- (indiscernible) Lafayette goes this way -- you passed -- you were still on East 16th, but you passed Lafayette Street.

MALDONADO:  What happened to [Tucker]?  I'm not saying there's a reason that happened days, before months before.  It could have been something right there.  Something he told you.

. . . .

MALDONADO:  I don't think it's easy to admit you killed somebody.

GRANT:  I didn't kill anybody.

MALDONADO:  Yeah.  It's tough.  Taking a life ain't easy to do.  I'll tell you right now.  Taking a life ain't easy.

GRANT:  I don't kill nobody.

MALDONADO:  You guys – (indiscernible) buddies like that.  But I'm not saying you guys are buddies, and you guys – you just told me you said you hustle on the same block.  But you guys were f***ing drinking coffee together and hanging out.

. . . .

MALDONADO:  What did you tell me?

15

A-1459-22

GRANT:  I told you I went up Governor Street.

MALDONADO:  <u>You're gonna stick with that?  You sure you want to stick with that story</u>?

GRANT:  That's all I have.

MALDONADO:  Okay.  So (indiscernible) <u>all that evidence</u> (indiscernible) <u>in front of you</u> (indiscernible).  <u>Like what caused you to do it</u>?  Did he flash some money?  Disrespect you?

GRANT:  No.  Never.

MALDONADO:  No?  So what did he do?  <u>Why did you shoot him?</u>

GRANT:  I didn't shoot him.

MALDONADO:  <u>Why did you shoot him?</u>

GRANT:  I didn't shoot him.

MALDONADO:  That's the whole point.  <u>Everybody's going to want to know.</u>  (Indiscernible) something that he should have done another way.  (Indiscernible).  F***.  It is what it is, you know.  <u>Is that the reason why you killed him?</u>

GRANT:  I didn't kill him.

Defendant points out he was deprived of the opportunity to cross-examine Detective Maldonado at the second trial and faults the trial court for not reviewing the redacted video before it was shown to the jury and for failing to provide any limiting instruction regarding Detective Maldonado's statements.

16

He argues in a case that was even "less compelling" on retrial given Robinson's change in testimony, these errors deprived him of a fair trial.

Because defendant complains about these portions of the redacted video for the first time on appeal, we apply the plain error standard of review and will not reverse unless the error was "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2; see also State v. Bragg, 260 N.J. 387, 404 (2025). In the context of a jury trial, relief will be afforded when the possibility of an unjust result is "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971); see also Bragg, 260 N.J. at 404. "To determine whether an alleged error rises to the level of plain error, it 'must be evaluated in light of the overall strength of the State's case.'" State v. Clark, 251 N.J. 266, 287 (2022) (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)) (internal quotation marks omitted). "[A] guilty verdict following a fair trial and 'based on strong evidence proving guilt beyond a reasonable doubt[ ] should not be reversed because of a technical or evidentiary error that cannot have truly prejudiced the defendant or affected the end result.'" Cotto, 471 N.J. Super. at 537 (second alteration in original) (quoting State v. J.R., 227 N.J. 393, 417 (2017)).

N.J.R.E. 701 permits witness testimony from non-expert, or lay, witnesses "in the form of opinions or inferences . . . if it (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or in determining a fact in issue."  To satisfy the components of N.J.R.E. 701, a lay witness must "testify based on knowledge personally acquired through the witness's own senses."  State v. Sanchez, 247 N.J. 450, 469 (2021).  However, "[a] witness may not offer lay opinion on a matter 'as to which the jury is as competent as [the witness] to form a conclusion.'"  Id. at 469-70 (alterations in original) (second alteration in original) (quoting State. v. McLean, 205 N.J. 438, 459 (2011)).  And lay witnesses may not "express a view on the ultimate question of guilt or innocence" because doing so would "intrude on the province of the jury."  State v. C.W.H., 465 N.J. Super. 574, 593-94 (App. Div. 2021) (quoting McLean, 205 N.J. at 461).

Lay witness testimony from police officers may be permitted under N.J.R.E. 701 "based on their personal observations and their long experience in areas where expert testimony might otherwise be deemed necessary."  State v. Trinidad, 241 N.J. 425, 445 (2020) (quoting State v. LaBrutto, 114 N.J. 187, 198 (1989)); see also State v. Singh, 245 N.J. 1, 20 (2021) (holding a police officer's testimony as a lay witness was proper where it was "rationally based on his

perceptions" and was helpful to the jury).  An important caveat is that "police officers may not opine directly on a defendant's guilt in a criminal case." Trinidad, 241 N.J. at 445; see also C.W.H., 465 N.J. Super. at 594 (finding interrogating police officer's "opinions as to defendant's truthfulness and guilt . . . [are] not admissible as . . . lay opinion" (alteration in original) (quoting State v. Tung, 460 N.J. Super. 75, 101 (App. Div. 2019))).  A law-enforcement officer's opinion about a defendant's credibility or guilt is particularly concerning because in giving the opinion the officer may "suggest[] that [his] own experience and specialized training enabled him to determine that defendant was lying" or guilty.  C.W.H., 465 N.J. Super. at 594  (quoting Tung, 460 N.J. Super. at 103).

"[T]he failure to object to testimony permits an inference that any error in admitting the testimony was not prejudicial."  Cotto, 471 N.J. Super. at 537.  The choice to permit some redactions and not others may be a strategic decision made by defense counsel in presenting the case to the jury.  Id. at 538 (finding defense counsel strategically used interrogation statements to show detectives "were so firmly convinced of defendant's guilt that they stopped investigating the crime prematurely" and, thus, the defendant would be "hard pressed to argue on appeal the jury should not have heard the detectives' repeated accusations").

The State asserts the excerpts of the redacted video about which defendant now complains are not nearly as bad as the portions of the original video we expressly addressed in our 2022 decision. That may be true. But they are bad enough. The statements the jury in the second trial heard may not have been as direct as the statements the jury in the first trial heard, but their meaning was equally clear: Maldonado was saying defendant was lying about turning onto Governor Street and lying about not being the shooter. And the detective's reference to "all that evidence" suggests he had some superior knowledge of what had occurred.

We recognize "the failure to object to testimony permits an inference that any error in admitting the testimony was not prejudicial" and that the choice to permit some redactions and not others may be a strategic decision made by defense counsel in presenting the case to the jury. Id. at 537-38. We are not convinced that inference applies under the circumstances of this case. In Cotto, we found defense counsel's failure to request redaction of some interrogation statements may have been a strategic decision because defense counsel in summation expressly highlighted the detectives' "aggressive interrogation technique" and "relied upon the very portions of the interrogation recording now claimed to be prejudicial to show that the detectives were so firmly convinced

of defendant's guilt that they stopped investigating the crime prematurely and thus failed to find the true culprit." Id. at 538. That didn't happen in this trial.

It may be that Detective Maldonado was "not expressing [his] opinion in the guise of assisting the jury, but rather expressing [his] opinion to defendant to prompt him to reply in the course of the stationhouse interrogation." Cotto, 471 N.J. Super. at 540. But as we held in our 2022 decision, "[w]hile these statements may be viewed as proper interrogation techniques, they were not proper statements to present to the jury." Grant, slip op. at 25 (citing State v. Patton, 362 N.J. Super. 16, 31-36, 38-39 (App. Div. 2003)).

An appropriate limiting instruction may have been sufficient to address the prejudice caused by the admission of the detective's statements. But, inexplicably, the trial court did not issue a limiting instruction. Despite the holding in our 2022 decision that "the lack of any limiting instruction on the use of Maldonado's statements" had added "to the risk that Maldonado's statements led the jury to returning a verdict it may not have otherwise reached," the trial court in the second trial again failed to give the jury a limiting instruction providing guidance on the use of Detective Maldonado's statements. Id. at 26-27.

> At a minimum, the jury should have been instructed that the detective's statements made during the stationhouse

> interrogation should not be deemed testimony and may be considered only in the context of understanding how the interrogation was conducted and how defendant responded to the forceful accusations that were made against him during the course of the interrogation.

[Cotto, 471 N.J. Super. at 540.]

That instruction is even more critical in a trial in which the interrogating officer did not testify and the defendant had no opportunity to confront him in cross-examination. See State v. Walden, 370 N.J. Super. 549, 557 (App. Div. 2004) ("[P]rejudice, of course, is compounded intolerably in the absence of confrontation and the ability to cross-examine"). The trial court's failure to issue that limiting instruction was error. See Cotto, 471 N.J. Super. at 540 (finding court's failure to give sua sponte a limiting instruction regarding an interrogating officer's statements was error).

And we conclude that error was plain error, requiring the vacation of the convictions. In Cotto, we held the court's error in failing to give a limiting instruction did not rise to the level of plain error. Id. at 541. "[C]onsidering the strong admissible evidence proving guilt beyond a reasonable doubt, . . . we d[id] not believe the failure to issue a limiting instruction was capable of producing an unjust result." Id. at 540-41. This case, however, lacks "strong admissible evidence proving guilt beyond a reasonable doubt." Id. at 541. In

22

the 2022 decision, we concluded the evidence presented against defendant in the first trial "was not overwhelming[,] . . . hing[ing] on Robinson's credibility . . . and the poor quality of the surveillance videos." Grant, slip op. at 27. The evidence in the second trial was even less overwhelming. As in the first trial, the State did not present any witnesses to the shooting or physical evidence linking defendant to the shooting. No one contends the quality of the surveillance videos improved. And although Robinson in the first trial claimed defendant had admitted to the murder days after it occurred, he did not make the same claim in the second trial.

Because the possibility of an unjust result in this case is "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached," Macon, 57 N.J. at 336, we conclude the trial court's error in permitting the jury to hear Detective Maldonado's statements without issuing a limiting instruction on their use constitutes plain error. Accordingly, we are constrained to vacate the convictions and remand for a new trial.

II.

Defendant argues for the first time on appeal the prosecutor "violated numerous prohibitions on prosecutorial argument" in his summation and thereby

deprived defendant of a fair trial. Defendant asserts the prosecutor in his summation "testified to new facts" about the surveillance videos and Robinson's plea deal, "misrepresented the evidence to bolster Robinson's claims," "personally vouched for Robinson's credibility and for the thoroughness of the police investigation," and "unnecessarily injected emotion into the trial" by making graphic statements in his opening and closing arguments and by comparing defendant to the characters in the movie Goodfellas.

"[P]rosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries . . . ." Clark, 251 N.J. at 289 (quoting State v. Williams, 244 N.J. 592, 607 (2021)). But a prosecutor's obligation is "to see that justice is done." Williams, 244 N.J. at 607 (quoting State v. Frost, 158 N.J. 76, 83 (1999)). Accordingly, "[p]rosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." Clark, 251 N.J. at 289-90 (quoting Frost, 158 N.J. at 82). "[A]s long as the prosecutor stays within the evidence and the legitimate inferences therefrom, [t]here is no error." Id. at 290 (alterations in original) (quoting Williams, 244 N.J. at 607); see also State v. McNeil-Thomas, 238 N.J. 256, 279 (2019) (finding no prosecutorial misconduct because the prosecutor was permissibly asking the jurors to make inferences from facts

presented at trial rather than making assertions that lacked evidential support). However, "'[r]eferences to matters extraneous to the evidence' may constitute prosecutorial misconduct." Williams, 244 N.J. at 607 (quoting State v. Jackson, 211 N.J. 394, 408 (2012)).

When "a prosecutor's remarks stray over the line of permissible commentary, our inquiry does not end." Id. at 608 (quoting McNeil-Thomas, 238 N.J. at 275). "Rather, we must weigh 'the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial.'" Ibid. (quoting State v. Wakefield, 190 N.J. 397, 437 (2007)). "In deciding whether prosecutorial conduct deprived a defendant of a fair trial," we consider "'whether defense counsel made timely and proper objections to the improper remarks.'" Ibid. (quoting Frost, 158 N.J. at 83). "If defense counsel fails to object contemporaneously to the prosecutor's comments, 'the reviewing court may infer that counsel did not consider the remarks to be inappropriate.'" Clark, 251 N.J. at 290 (quoting State v. Vasquez, 265 N.J. Super. 528, 560 (App. Div. 1993)).

Ultimately, a conviction should be overturned "on the basis of prosecutorial misconduct only if 'the conduct was so egregious as to deprive defendant of a fair trial.'" Williams, 244 N.J. at 608 (quoting McNeil-Thomas, 238 N.J. at 275). To warrant granting a new trial, a defendant must show there

had been "some degree of possibility that [the prosecutor's comments] led to an unjust result." McNeil-Thomas, 238 N.J. at 276 (alteration in original) (quoting State v. R.B., 183 N.J. 308, 330 (2005)).

## A.

Defendant first claims the prosecutor "testified in summation about several previously unexplored portions of the surveillance videos, depriving defendant of his right to cross-examine those claims." According to defendant, the prosecutor claimed for the first time in summation that defendant was wearing light-colored clothing like the suspected killer in the surveillance videos. Defendant argues that because no witness testimony or other evidence identified defendant in the light-colored clothing, it was not proper for the prosecutor to display stills and identify defendant as the person in those clothes in the surveillance videos during summation. Defendant also argues it was improper for the prosecutor to opine as to defendant's "style of walk" without presenting lay or expert testimony and to urge the jury to infer defendant was the person walking with the victim before and after the intersection with Governor Street.

Similarly, defendant argues it was improper for the prosecutor to reference specific scenes in the surveillance video from the Alto Rango Lounge during

26

summation and to replay other footage showing another person the prosecution claimed to be defendant. In particular, defendant argues the following statement by the prosecutor in summation was improper:

> There's going to be one crucial moment on the surveillance video that I'm going to draw your attention to. It's going to be at 1:55 and 25 seconds. When that surveillance video is played, Charles Grant who identifies himself on the video. It's going to be on the top of the screen with another individual. Isaac Tucker is going to be at the bottom, towards the bottom of the establishment. What you're going to see is you're going to see Mr. Grant look in Mr. Tucker's direction and then do something. I want you to focus on it when we play that.
>
> . . . .
>
> It's your perception [that] controls, but that surveillance footage, the State argues to you, is intent. It shows this wasn't some random act, it was planned.

The statements cited by defendant did not constitute prosecutorial misconduct. The prosecutor was permissibly asking the jurors to make inferences from facts presented at trial rather than making assertions that lacked evidential support. In discussing the clothing, he was responding directly to a comparison defense counsel had made in summation between the color of defendant's clothing and the color of the person depicting in the surveillance videos. When discussing the characteristics of the individuals depicted in those

videos, the prosecutor was responding to defense counsel's assertion in summation that the person walking with defendant after the Governor Street intersection was not defendant. When reviewing a prosecutor's summation, "we 'must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo.'" State v. Engel, 249 N.J. Super. 336, 379 (App. Div. 1991) (quoting United States v. Young, 470 U.S. 1, 12 (1985)). In his clothing-color comments, the prosecutor "did no more than respond substantially in order to 'right the scale.'" Ibid. (quoting Young, 470 U.S. at 13).

The prosecutor in his summation repeatedly stated the jury's perception of the evidence controlled, not his perception. In referencing particular portions of the surveillance videos, the prosecutor was not improperly testifying or engaging in gamesmanship but was permissibly highlighting those portions of the tapes and asking the jurors to make inferences based on their own perceptions of that evidence. See State v. Watson, 254 N.J. 558, 600 (2023) (finding counsel "can pinpoint particular spots in a video during closing argument").

28

B.

Defendant complains about these statements the prosecutor made in summation about Robinson and his plea agreement:

> [Robinson's] plea agreement when he got charged with his own gun crime. Look at that agreement in the back. The agreement is like a contract if anyone's familiar with a contract, the four corners of the agreement. Everything in there – we do this every day in this courthouse, all types of cases. Anytime anyone enters a plea on the record, four corners of the contract. Everything in there is exactly what's agreed upon, including promises. And you go through all these pages. It's a standard form from the judiciary. It's in evidence, check it out, see if there's any mention in there for Demetrius Robinson, you have to come and testify, you have to provide truthful testimony, you have to do anything. Nope. All that plea agreement says is he agrees to plead guilty and gets five years in New Jersey State Prison or 42 months before parole . . . . He never tried to leverage any information he had to help himself . . . . But nowhere in that plea does it say anything about anything in this case. Not once did he try to do any of that at all to help him.

Defendant argues the prosecutor "essentially testified in summation about the plea-agreement process, bolstering the State's theory that the police informant received no benefit from testifying against defendant" and asserting facts based on his personal experience that were not in evidence. We agree.

In that portion of the summation, the prosecutor improperly made factual assertions generally about plea agreements and particularly about Robinson's

plea agreement that were not in evidence. He also presented himself, saying "we do this every day in this courthouse," as having specialized knowledge. State v. Feaster, 156 N.J. 1, 59 (1998) (finding "[a] prosecutor is guilty of misconduct if he implies to the jury that he possesses knowledge beyond that contained in the evidence presented, or if he reveals that knowledge to the jury").

Those statements by the prosecutor mattered. During the trial, Detective Adams testified on cross-examination that Detective Maldonado had said after Robinson was detained on the gun charge, "we will try to help him in any way we can." In contrast, Robinson denied his plea deal was premised on an agreement to testify in this case. Telling the jury based on his experience in the courtroom that a plea agreement is a "contract," referencing the "four corners of the contract," and asserting "[e]verything in there is exactly what's agreed upon, including promises" can reasonably be interpreted as in improper attempt to provide in summation expert testimony that any agreement between Robinson and the detectives had to be limited to what was set forth in writing in the plea agreement, which did not include a requirement he testify in this case. The trial court's generic instructions that comments by counsel were "not controlling" and "summations . . . are not evidence and must not be treated as evidence" were not sufficient to eradicate the prejudice caused by these statements.

30

Given the limited evidence presented against defendant at trial and the importance of Robinson's testimony to the State's case, we conclude those statements deprived defendant of a fair trial and had a sufficient probability of leading to an unjust result to justify vacation of his convictions.

C.

Defendant argues the prosecutor in his summation impermissibly bolstered Robinson's credibility by repeatedly telling the jury Robinson was truthful. Specifically, defendant cites the following portion of the prosecutor's summation, highlighting the underlined language:

> [Robinson] was very truthful here, especially when [defense counsel] asked about his convictions. He didn't hold anything back. He knows the system. He tells you about it. He was educating you. He said, oh, you never take the first deal, you always take the second one, things improve. He knows what's going on . . . . Not once did he try to do any of that at all to help him. Why? Because he told you, he was best friends with Isaac Tucker. He told the truth and he told the truth about what he saw because it bothered him so much because that was his best friend and also told the truth about Charles Grant defiling that shrine, and he told the truth about Charles Grant brandishing that Glock. That happened. That's the truth and Demetrius Robinson told you exactly what happened.

"A prosecutor may argue that a witness is credible, so long as the prosecutor does not personally vouch for the witness or refer to matters outside

31

the record as support for the witness's credibility." Walden, 370 N.J. Super. at 560. Additionally, a prosecutor may respond to defense counsel's attacks on a witness's credibility. See State v. Smith, 212 N.J. 365, 407 (2012).

In his closing argument, defense counsel directly challenged Robinson's credibility. The prosecutor was permitted to respond to that challenge. And in responding to defense counsel's comments, the prosecutor did not make factual assertions that lacked evidential support but permissibly asked the jury to make inferences based on the testimony presented. We perceive no prosecutorial misconduct in these statements.

D.

Defendant argues the prosecutor in his opening and closing statements "unfairly vouched for the thoroughness and competence of the police investigation" and hindered a "critical part of the defense . . . to impeach the thoroughness of the police investigation." Defendant does not cite specific portions of the prosecutor's opening statement. He argues the following statement in the prosecutor's summation was improper:

> [T]he Paterson police in this case did a thorough investigation. They went where the evidence led them. They didn't have any preconceived notions on what that would be. They followed every lead possible and did everything they could in this case and at the end of the day, the evidence points in one direction and one

32

direction only, that beyond a reasonable doubt that Charles Grant is the man that did this to Issac Tucker. Paterson police so thorough . . . . They went and they lost sight of that individual and they went there [to the 22nd Street residence] and they did a thorough investigation. They took crime scene photos and they swabbed for any DNA evidence long before the investigation was complete because they wanted no stone unturned. It's where the evidence leads, no preconceived notions.

Defendant also contends the prosecutor improperly personally vouched for the competence of the DNA expert in summation:

You heard from [her], all the accreditations from New Jersey State Police Lab. This isn't some back woods place run out of a basement. This is [a] nationally accredited institution by the New Jersey State Police Office of Forensic Scientists. Judge the credibility. She knows what she's talking about? She knows a heck of a lot more about DNA than I do. I think she does and she's an expert in the field.

We do not perceive any prosecutorial misconduct in these statements. Again, the prosector in his comments, even his comment that "[t]hey followed every lead possible," was not testifying as to facts not in evidence but asking the jury to draw inferences based on the evidence presented. And he was responding directly to the attacks defense counsel made in his summation to the testimony and actions of law-enforcement officials. In saying "I think she does and she's an expert in the field," the prosecutor arguably was vouching for the DNA

expert. But, she had been admitted as an expert in the field of forensic DNA analysis with no objection from defendant, and that she had more DNA knowledge than the prosecutor was a fair inference to draw given her experience and qualifications.

E.

Defendant argues these portions of the prosecutor's opening statement "only served to prejudice the jury against Grant" by appealing to emotion:

> At a certain point while the two of them are walking down the street and Isaac Tucker thinks he's walking with someone he's known for ten years, the evidence will show Charles Grant turned to him, pulled out a handgun at close range and shot him in the face. He shot him in the eye with the projectile exiting his neck, and when Isaac Tucker's body fell on the cold streets of Paterson on February 23rd, 2015[,] the evidence will show Charles Grant continued firing that handgun at his lifeless body on the ground to make sure the job was done, and then you will be presented evidence, after this occurred, he almost calmly strolls away. It's a slight little jog and he just strolls away like nothing happened.
>
> . . . .
>
> So you'll hear from the first officer who responded that night to a call, shots fired, multiple shots fired, in this location, 296 East 16th Street. And what he's going to tell you is that Charles Grant left Isaac Tucker there like a pile of garbage, because that officer, when he arrived on the scene, thought that Isaac Tucker's body at first was a bag of trash because he was wearing all black. That's how Charles Grant, who knew this man for ten

years, left his friend, dying, dead, on the streets of Paterson.

Defendant argues in summation, the prosecutor again improperly appealed to emotion, first by introducing a quote from a "fictional movie," and then by commenting on the crime at issue:

> Now, ladies and gentlemen, I want to conclude with a quote for you. It's from a movie, it's a fictional movie, but sometimes movies have some variance of truth, so in this case it's from a title move -- an academy award winning film and I think this quote [is] spot on to what happened in this case. The quote goes something like this.
>
> Not like the movies, there's not a lot of yelling and screaming before it happens. Your murderers comes [sic] with smiles, they come as your friends, they come as people you've known your entire life and trusted and they come at a time when you least expect it.
>
> Ladies and gentlemen, that is what this evidence has shown beyond a reasonable doubt, that on that cold frigid night in the City of Paterson, Isaac Tucker thought he was walking with a friend, but he was being led to his execution by his executioner and he didn't know it. In his last moments he thought he was with a friend until he makes that sudden realization on those street[s] when Charles Grant produced that Glock handgun two inches from his face that his life was over and his time on this planet had come to an abrupt end and that's how Isaac Tucker left this world. He left this world alone on the streets of Paterson on a frigid night in a pool of his own blood where he looked like a pile of garbage literally, as Detective Kelly described when he was driving down the street and had to stop because

35

he thought it was a garbage bag.  That's how Isaac Tucker left this world thanks to his quote/unquote friend, Charles Grant . . . .

The prosecutor did not reference by name the movie he had quoted. According to defendant, the quote came from the movie <u>Goodfellas</u>.  Defendant relies on <u>Williams</u>, 244 N.J. at 615, but the prosecutor's unnamed movie quote in this case is not comparable to the prosecutorial statements and actions the Court found prejudicial in <u>Williams</u>, a case about a robbery.  In that case,

> the prosecutor showed the jury a PowerPoint presentation in her closing that contained a still photograph from the movie <u>The Shining</u> and commented, "if you have ever seen the movie <u>The Shining</u>, you know how his face gets through that door."  The PowerPoint slide depicted Jack Nicholson in his role as a violent psychopath who used an ax to break through a door while attempting to kill his family. The photograph contained the words spoken by Nicholson in the movie scene as he stuck his head through the broken door – "Here's Johnny!"  The slide also bore the heading "ACTIONS SPEAK LOUDER THAN WORDS," a theme used by the State throughout the trial to suggest to the jury that defendant's conduct in the moments leading up to and following defendant's passing the note to the teller supported a finding of robbery when viewed in context.  The photograph was not previously  shown to the court or defense counsel and had not been used at trial or offered or admitted into evidence.
>
> [<u>Id.</u> at 599-600.]

The prosecutor talked about the photograph and the movie:

36

> We've all seen this, right? This movie? And, you know, these words, "Here's Johnny." Right? If you've never seen the movie, <u>The Shining</u>, this is creepy, but not scary, right? You've never seen it. All right. This guy looks creepy and he's saying some very unthreatening words, "Here's Johnny." But if you have ever seen the movie <u>The Shining</u>, you know how his face gets through that door. So, again, I just point that out to illustrate. It's not just the words; it's what you do before and what you do after the words that matters. And that's what makes this a robbery.

> [<u>Id.</u> at 602-03 (footnote omitted).]

By her inclusion of the photograph from <u>The Shining</u> and her commentary, the Court held the prosecutor "went far beyond the evidence at trial to draw a parallel between defendant's conduct and that of a horror-movie villain." <u>Id.</u> at 615.

"A prosecutor is . . . entitled to argue the merits of the State's case 'graphically and forcefully.'" <u>Smith</u>, 212 N.J. at 403 (quoting <u>Feaster</u>, 156 N.J. at 58); <u>see also</u> <u>State v. DiPaglia</u>, 64 N.J. 288, 305 (1974) (Clifford, J., dissenting) ("A prosecutor is not expected to conduct himself in a manner appropriate to a lecture hall. He is entitled to be forceful and graphic in his summation to the jury, so long as he confines himself to fair comments on the evidence presented."). A prosecutor, however, "may not make 'inflammatory and highly emotional' appeals which have the capacity to defer the jury from a

fair consideration of the evidence of guilt." Id. at 111 (quoting State v. Marshall, 123 N.J. 1, 161 (1991)).

The prosecutor's brief movie quote in this case did not rise to that prejudicial level. Nor did his other comments about the crime at issue, which were drawn from the evidence presented during the case and reflected fair comment on that evidence. Cf. State v. Blakney, 189 N.J. 88, 95 (2006) (finding prejudicial prosecutor's reference in summation to "the sorrow and anger and rage" he felt when looking at photographs of the victim's injuries). We perceive no prosecutorial misconduct in these comments.

## III.

Defendant faults the trial court for comments it made in front of the jury in the presence of counsel and for comments it made in front of the jury outside the presence of counsel. Although the court did not err in the comments it made to the jury in the presence of counsel, we conclude the court erred in its address to the jury outside the presence of counsel and that error warrants vacation of the convictions.

Defendant first complains about the court commending both counsel at the beginning of the jury charge. The court made the following statement:

> At the outset, let me express my thanks and appreciation to you for your attention in this case. I

38

would like to commend both counsel for the professional manner in which they have presented their respective cases and for their courtesy to the court and jury during the course of this trial.

Usually it's my standard practice, you don't see this, but I bring both counsels -- after both closings, I bring them into chambers and I shake hands with them. It's the only time I shake hands with my counsels and -- because, you know, it's a responsibility that they both have and it's a function that attorneys perform in our courts.

Defendant contends that statement had "the clear capacity to further prejudice Grant by effectively endorsing the prosecutor's summation as not only lawful but commendable" and "heightened the risk that jurors relied on the prosecutor's improper arguments instead of their own view of the evidence."

We don't read the court's comments that way at all, and, apparently, neither did defense counsel, who did not object to them. The court made the comments after both counsel had presented their summations and after the court had dismissed the jury for a break before charging the jury. More important, the comment was not particular to the prosecutor. The court stated bringing counsel into chambers after closing and shaking their hands was "standard practice" and was equally complimentary to both counsel. We perceive no impropriety in these entirely-neutral statements.

Defendant also complains about statements the court made in front of the jury outside the presence of counsel. After the court charged the jury, it dismissed the jury for the day. When the jury returned, the court stated:

> As I reminded you, attorneys are not here, the defendant is not here. The reason I do this one is for you as soon as you're in, your function is deliberating jurors go in, non-deliberating jurors go back to the jury management so you don't have to wait. That's [the] first step.
>
> Second step is because you have already been given instruction, there is nothing else that's going to happen, I simply try to streamline this one, because in the morning it's, you know, attorneys have other business they're trying to do in the building. And if I need them, I get them right away. Because we have their cell phone numbers, and we text them. Two things are going to happen that we will give you all of the evidence. I'm going to read all of the exhibits that are going with you into the jury room.
>
> . . . .
>
> So once I read these into the records, we will give you this box, and I will go over what's in the box. And there are two boxes here, plastic boxes. That's for your cell phone and your iPhone, iPad. Just make sure when you go for lunch you pick it up. When you come back, you drop it off.
>
> . . . .
>
> Now let's go into the records. These are the State exhibits. They're not in any particular order. As I was going through that this morning, I just put them in. S-78, S-41, 42A, S-83, S-84, S-85, S-86, S-87, 88, 89,

90, 91, 92, 93, 74A, 74C, 81A, 80A, 79A, 78A, 77A, 76A, 75A, 68, 67, S-139B, S-140B, S-138B, S-141B, S-137B. These are all of the ones in the envelope and the blown-up maps.

And the remaining are the other exhibits. These are pictures. S-2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 36, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 54, 116, 117, 118, 119, 120, 121, 122, 123, 136, 137A, 138A, 139A, 141A, 140A, 144, 145, 146, 147 and 148. Those are all of the State exhibits.

And these are the Defense exhibits. D-12, D-13, D-10, D-9, D-8, D-7, D-5, D-6, D-4, D-3, D-2 and D-1. So these are in evidence.

. . . .

This one here, verdict sheet. This is sealed, so you don't have to open the envelope. There's nothing in here. It simply signifies that you have reached a verdict. These are the ones that are marked question. They're open, so -- which means you can write the question. Put it -- just write it there. Just put it right inside the envelope and then you can simply send this one over, ring the bell.

Here is the doorbell. (Doorbell demonstrated.) If you need attention, you need pens, you need -- whatever you need, just ring this one. [One of the court officers] or someone will knock on the door. And when they knock on the door, until you say come in, the second door will not be opened. Why? Because you may be in deliberations. You may have marked things up there. Just simply cover them so that the officers can take the envelope and do what they need to do.

41

A-1459-22

> There's a verdict sheet here. There's only one, because this is one verdict sheet that you all unanimously would have to agree on. That this will be completed by the foreperson, signed and dated. And, you, foreperson, after you complete this one, fold it like this, in half, and when you come in, this is the way you're going to keep it. And when I ask the officer you will give this to the officer, and we will go through these one more time. There are pens, pencils and everything else in here.

The court then explained to the jury the process the court would follow regarding the four non-deliberating jurors and where they would be located while the other jurors deliberated.

When identifying the exhibits that had been moved into evidence, the court omitted exhibit D-11. That exhibit was admitted into evidence during Robinson's cross-examination. It was a court document containing information regarding Robinson's March 6, 2015 arrest for possession of a handgun, his December 17, 2015 guilty plea to unlawful possession of a weapon, and the five-year term of imprisonment he had received.

Defendant argues the trial court, by addressing the jury outside the presence of defendant and his counsel, denied him his rights to be present and to have counsel and deprived him of a fair trial by failing to submit to the jury D-11, which defendant describes as a "key defense exhibit." He also argues that because these discussions with the jury were conducted ex parte, he was

42

deprived of the opportunity to object to the instructions the court gave the jury and to the court's failure to provide D-11 to the jury.

The Sixth Amendment of the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee a defendant's right to be present at trial. State v. Dangcil, 248 N.J. 114, 135 (2021); see also R. 3:16(b) ("the defendant shall be present at every stage of the trial, including the impaneling of the jury . . . ."). "The Sixth Amendment similarly guarantees defendants the right to counsel during 'critical stage[s]' of the adversarial process." Dangcil, 248 N.J. at 135 (alteration in original) (quoting State v. Harris, 181 N.J. 391, 440 (2004)). "Article I, Paragraph 10 of our State Constitution 'is consonant with the Federal Constitution on the issue of when the right to counsel is triggered.'" Ibid. (quoting State v. A.O., 198 N.J. 69, 82 (2009)) (internal quotation marks omitted). As our Court explained in State v. A.R., 213 N.J. 542, 557-58 (2013):

> The presence of a defendant at trial is a condition of due process to assure a fair and just hearing, which is protected by the Fourteenth Amendment. [State v.] Hudson, . . . 119 N.J. [165,] 171 [(1990)]. Vindication of that right requires a defendant to be present at every stage of the proceedings, "'whenever . . . presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" State v. Dellisanti, 203 N.J. 444, 453 (2010) (alteration in original) (quoting Snyder v. Massachusetts, 291 U.S.

97, 105-06 (1934), <u>abrogated in other part by</u> <u>Malloy v. Hogan</u>, 378 U.S. 1 (1964)).

Thus, "[a] defendant's right to be present is not absolute," <u>State v. Reevey</u>, 417 N.J. Super. 134, 150 (App. Div. 2010), and does not apply to every proceeding in a criminal case, <u>see</u> <u>Dangcil</u>, 248 N.J. at 138 (finding "pre-voir dire process of disqualifying, excusing, and deferring prospective jurors is not a stage at which defendants and counsel are entitled to be present").

"[T]o determine whether a defendant's presence at particular stages of the trial is critical to its outcome or the fairness of the proceeding, courts must look to the nature of the hearing as a whole." <u>Reevey</u>, 417 N.J. Super. at 151. A defendant's right to be present "is evaluated in light of the reason for the right." <u>Id.</u> at 150. A defendant's presence is not required when the defendant "could have done nothing had [he] been present at the conference, nor would [he] have gained anything by attending." <u>Reevey</u>, 417 N.J. Super. at 151 (quoting <u>United States v. Gagnon</u>, 470 U.S. 522, 527 (1985)). A "defendant's right to be present is not triggered where '[t]he proceeding did not involve the receipt of evidence or the confrontation of witnesses.'" <u>Ibid.</u> (quoting <u>State v. Childs</u>, 204 N.J. Super. 639, 649 (App. Div. 1985)).

"Ex parte communications between a trial judge and a jury are improper and must be avoided. There is no place for them in the trial process." <u>State v.</u>

Morgan, 217 N.J. 1, 11 (2013). "[J]udges must be especially careful about their own contacts with the jury and should not interact with jurors outside the presence of counsel." Ibid.; see also State v. Brown, 275 N.J. Super. 329, 331 (App. Div. 2005) ("A judge should avoid engaging in any ex parte communications with the jury regarding its deliberations."). "There are no exceptions." Morgan, 217 N.J. at 11.

Despite that prohibition, not all ex parte communications by a judge with a jury require reversal of a conviction. Id. at 12. The Court in Morgan set forth the procedure to follow when evaluating a trial court's "inappropriate communications with a jury":

> (1) if the record affirmatively reveals that the defendant was prejudiced, reversal is required; (2) if the record does not show whether the ex parte contact was prejudicial, prejudice is presumed; and (3) if the record affirmatively discloses "that the communication had no tendency to influence the verdict," the outcome should not be disturbed.
>
> [Ibid. (quoting State v. Auld, 2 N.J. 426, 432 (1949)).]

Thus, in a particular instance of ex parte communications, the record "may be able to dispel a presumption of prejudice." Ibid.

No one would fault a court for simply wishing returning jurors good morning, welcoming them back to the courtroom, and directing them to enter

the jury room to begin their deliberations.  But the trial court in this case did much more than that.  The court told the jury the attorneys were not present because they had "other business they're trying to do in the building"; reviewed with the jury the contents of the box of evidence it was receiving; identified the State's exhibits and in part described them; identified defendant's exhibits; discussed the procedure for submitting a question; discussed the verdict sheet and the unanimity requirement; and instructed the jury regarding non-deliberating jurors.  These statements were not about mere "ministerial matters," as the State contends.  The trial court erred by engaging in this ex parte communication with the jury.

The critical nature of the proceeding given the court's communication with the jury and the potential prejudice are readily apparent.  In its charge, the trial court had instructed the jurors that "[a]ny exhibit that has not been admitted into evidence cannot be given to you in the jury room even though it may have been marked for identification. Only those items admitted into evidence can be given to you."  The court also instructed the jurors that "[y]ou will only consider such facts which in your judgment have been proven by the testimony of witnesses or from exhibits admitted into evidence by the court" and that "you must rely solely upon your understanding and recollection of the evidence that

was admitted during the trial." From those instructions, the jury could reasonably understand that an exhibit absent from the box of evidence provided by the court was not admitted into evidence and, thus, could not be considered in the jury's deliberation. In its ex parte communication, the court identified the exhibits the court was giving to the jury for use in the jury room during its deliberation; the court did not mention D-11. Had counsel been present, they could have objected to the inaccurate recital of the exhibits and clarified whether D-11 had been omitted from the box of evidence or the court had merely misspoken, thereby ensuring the jury had all of the exhibits entered into evidence. Thus, counsels' presence during this proceeding mattered.

The State contends the omission of D-11, if it were omitted, was of no import because the jury had D-10, Robinson's plea form. The State asserts D-10 rendered D-11 superfluous because D-10 contained information regarding Robinson's guilty plea, the maximum sentence exposure he faced, and the State's recommendation of a shorter sentence. Defendant disputes that contention, calling D-11 a "key defense exhibit." Neither exhibit was included in the appellate record. Whatever information was contained in the exhibits, defendant had a right to have the jury consider <u>all</u> of the exhibits his counsel had entered into evidence. An omission of D-11, considering the instructions

47

the court gave the jury about what evidence it could consider and what exhibits the court was providing to the jury, would have the effect of depriving him of that right.

But was D-11 omitted?  The State contends the court misspoke, D-11 was sent into the jury room with the other exhibits, and the record is "able to dispel a presumption of prejudice."  Morgan, 217 N.J. at 12.  The State cites a discussion the court had with counsel after the jury rendered its verdict and was dismissed.

> THE COURT:  I return them back to all of you.  All right.  We're back on the Grant trial. [Counsel], with regard to the exhibits that were given, that were admitted into evidence, given to the jurors, have now been returned to both of you.  I simply want an acknowledgment from you that you have returned those exhibits back.  Because what happens is on the appellate -- for appellate purposes, you know, you're going to be needing those.  So you -- our files get filed away.  And later on there are requests, and the court does not keep these exhibits.
>
> [PROSECUTOR]:  State is in receipt of all exhibits that were moved into evidence at trial, Your Honor.
>
> [DEFENSE COUNSEL]:  Judge, . . . I have Defense Exhibit 12, 11 –

The court advised defense counsel it did not "need the numbers" but was asking if counsel had received back "all of the exhibits."  Defense counsel

48

responded, "I can't possibly have 12 and 11 and say that I have all of them."

Counsel conferred, and the following discussion ensued:

> [DEFENSE COUNSEL]: I think, Judge, I have them all.
>
> [PROSECUTOR]: Sorry, Judge. . . . [T]he jurors, I guess, when they were reviewing the exhibits they're [sic] interspersed State and Defense. So I'm just going to –
>
> THE COURT: No, no, no. Don't do that, because that's what they're supposed to do.
>
> [PROSECUTOR]: Yeah. I'm just going through --
>
> THE COURT: The package came back as it went in --
>
> [PROSECUTOR]: Yeah. I'm just going through the big --
>
> THE COURT: Yeah.
>
> [PROSECUTOR]: -- packet to double check there's nothing mixed in --
>
> THE COURT: Yeah.
>
> [PROSECUTOR]: -- further. All right. That should be it.
>
> [DEFENSE COUNSEL]: I think I need 10.
>
> [PROSECUTOR]: What was it? D-10?
>
> [DEFENSE COUNSEL]: I'm not sure, but I have --

(Court and clerk confer.)

[PROSECUTOR]:  What was 10?

[DEFENSE COUNSEL]:  Had 11.  Was that it?

[PROSECUTOR]:  No.  What was 10, do you know?

THE CLERK:  The document, the plea form.

[DEFENSE COUNSEL]:  I have that as 11.

THE CLERK:  D-10 is your plea forms, 11 is your court document, 12 is a [judgment of conviction] and 13 is the photo of the block.

[DEFENSE COUNSEL]:  I don't think I have --

THE CLERK:  Everything else is photos.

[DEFENSE COUNSEL]:  I don't think I have the plea form in here.  Let me just -- oh, you know what, I have. I'm sorry.  That was, again, it was mixed in.  Okay.  Got you.  All right.

THE COURT:  All right.  [Defense counsel], do you have all of your exhibits that were admitted into evidence, correct?

[DEFENSE COUNSEL]:  I do, Judge.

THE COURT:  Okay.  How about you, [Prosecutor].

[PROSECUTOR]:  The State's in receipt of all exhibits.

That post-verdict discussion – which began with the court asking counsel if the exhibits "that were admitted into evidence, given to the jurors," had been

50

A-1459-22

returned to them and ended with defense counsel confirming all defense exhibits had been returned, convinces us D-11 was not omitted from the exhibits provided to the jury. Thus, although the court erred by engaging in an ex parte discussion with the jury and that error clearly was capable of prejudice, the record dispels the presumption of prejudice. Accordingly, we conclude the ex parte discussion is not a basis to reverse defendant's conviction.

IV.

As we have held, some of the errors we have identified – the admission of Detective Maldonado's statements, the failure to give a limiting instruction regarding those statements, and the prosecutor's comments in summation regarding Robinson's plea agreement – individually require vacatur of the convictions. Collectively, they require it. See State v. Weaver, 219 N.J. 131, 161-62 (2014) (applying the cumulative-error doctrine where the impact of multiple errors is not harmless).

Because we vacate the convictions, we do not reach defendant's argument regarding the sentence. To the extent we have not addressed them, we have considered all the remaining points and sub-points raised on appeal and deem them of insufficient merit to warrant discussion. R. 2:11-3(e)(2).

51

We note in closing that we do not render this decision lightly. We acknowledge the State, defendant, the deceased's family, and the witnesses now face a third trial regarding a senseless killing that took place more than a decade ago. But the fairness of a trial is at the core of our justice system, and we cannot overlook the errors that rendered this trial unfair. We are constrained to vacate the convictions and remand to the trial court for a new trial.

Vacated and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division